SHOEMAKER and another, Appellants, vs. KATZ, Garnishee, etc., imp., Respondent.

*September 7 — September 24, 1889.*

*Debtor and creditor: Fraud: Execution sale: Garnishment.*

The stock of goods of an insolvent debtor being about to be sold on executions, K. agreed with the debtor that he would buy the goods at such sale and proceed to sell them again; that he would pay certain creditors of the debtor and, after realizing enough out of the stock to reimburse him for all advances, with interest and a commission, would turn over the residue of the goods, if any, to certain of the execution creditors who were to assign their judgments to him. The agreement was carried out, but after K. had reimbursed himself there was no residue of the stock. There was nothing to impeach the fairness or validity of the execution sale; and K. had no notice that the creditors to whom the residue was to be assigned were not such in good faith, or of any contemplated fraud. Conceding that the judgments of such last-mentioned creditors were fraudulent, it is *held* that the agreement of K. was valid and, there being no residue, did not render him liable as garnishee at the suit of other creditors of the debtor.

APPEAL from the Superior Court for *Milwaukee* County. The appeal is by the plaintiff from a judgment for the defendants in a garnishee action.

In 1886 the principal defendants, who constituted the firm of L. Harris & Sons, were engaged in mercantile business in the city of Milwaukee. The firm became financially embarrassed, probably insolvent, and on December 24th of that year, near midnight, eight judgments were entered against it, aggregating about $26,500, on each of which an execution was immediately issued, delivered to the sheriff, and by him levied upon the stock of goods of the firm. The sheriff took and held possession of such stock, and advertised the same for sale, under the executions.

Of these eight judgments one was in favor of William Nast for about $2,500; another in favor of Esther Harris

for nearly $3,200; and a third in favor of Nast & Karger for a little over $5,150. These three judgment creditors had theretofore commenced actions on their respective demands (evidenced by promissory notes) against L. Harris & Sons, and their judgments were rendered upon default of the defendants therein, all of whom failed to answer. Esther Harris was the wife, and William Nast the son-in-law, of Leopold Harris, the senior member of the debtor firm. Daniel Nast was the partner in the firm of Nast & Karger, and is a brother of said William. These three judgments are alleged by the plaintiff to be fraudulent as against the creditors of L. Harris & Sons. The remaining five judgments, entered at the same time, are admitted to be valid demands against that firm. They amount to about $13,650.

Early in the morning of Monday, December 27, 1886, the firm of L. Harris & Sons executed a voluntary assignment for the benefit of creditors of its property to one George Tracy, who accepted the trust, qualified as such assignee, and filed a list of creditors and an inventory of assets. The assignment proceedings are in accordance with the requirements of the statute in that behalf. The inventory specifies the assets of the assignor as consisting of a general stock of merchandise, and states where it is situated, and that the same is in the possession of the sheriff under certain executions and attachments. Nothing further has been done under the assignment.

Very soon after the sheriff seized the stock of goods under such executions, actions were commenced against L. Harris & Sons by J. V. Farwell & Co. and H. B. Claflin & Co., on account of claims against that firm, aggregating nearly $40,000. These creditors threatened the defendant Leopold Harris with criminal prosecution for obtaining credit of them under false and fraudulent representations of the pecuniary condition of his firm, and pressed him for

an adjustment of their claims. Thereupon, and pursuant to a suggestion by the agent of Claflin & Co., Leopold Harris entered into an agreement with *Jacob Katz*, the garnishee herein, that *Katz* should purchase the stock of L. Harris & Sons at the execution sale, and convert the same into cash; that he might replenish the same from time to time to facilitate the sale of it; that he should pay the claims of Farwell & Co. and Claflin & Co.; that, when he had realized sufficient out of the stock to reimburse him for his payments to the sheriff, to the creditors last named, and the cost of goods purchased to replenish the stock, together with his necessary expenses, and to pay himself seven per cent. interest on such advances, and seven and one half per cent. commission on the gross sales of the goods, he would turn over the residue of the stock (if any of it should remain) to the three judgment creditors first above mentioned. The consideration of the agreement so to transfer the residue of the stock was, that at the same time those judgment creditors assigned their judgments to *Katz* without requiring him to pay them anything therefor, thus postponing the collection of their judgments to all of the payments above specified.

Leopold Harris estimated the value of the stock when seized at $90,000. Tracy, the assignee, in his inventory estimated it about $75,000, and in an attachment suit by Miller and others it was appraised at less than $52,000. The debtor firm had no other assets. Its indebtedness was about $100,000.

Pursuant to the agreement with Leopold Harris, the garnishee, *Katz*, bought the stock at the execution sale and paid the sheriff therefor $25,150. He procured assignments of the five unchallenged judgments before mentioned, entered December 24, 1886, paying therefor nearly $12,500; and thus, being the assignee of all the judgments on account of which the stock was sold, he afterwards received

from the sheriff the sum so paid for the stock, less costs, disbursements, and expenses. *Katz* thereupon paid Farwell & Co. and Claflin & Co., in compromise of their demands, about $27,000. He proceeded to dispose of the whole stock, including the goods purchased to replenish the same (which cost him $11,000), and realized therefrom $61,000. The amount which his contract with Leopold Harris authorized him to retain out of the proceeds of the sale exceeds $61,000.

This plaintiff recovered a judgment for $477.95 against L. Harris & Sons September 1, 1888, and instituted this action to charge *Katz*, as garnishee of that firm, with the payment of his judgment. *Katz* denied liability as garnishee, and the plaintiff took issue on his answer. A jury was impaneled to try such issue. At the close of the trial the court directed a verdict for the garnishee. From the judgment entered pursuant to the verdict the plaintiff appeals.

For the appellants there were briefs by *Turner & Timlin*, and oral argument by *W. H. Timlin*.

For the respondent there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas*, and oral argument by *J. G. Flanders*.

LYON, J. The contention of counsel for plaintiff is that if the judgments of William Nast, Esther Harris, and Nast & Karger are fraudulent and were assigned to *Katz* in trust for the use of Leopold Harris or his firm, this invalidates the agreement between Harris and the garnishee, *Katz*, and renders the latter liable as a garnishee in this action; and further, that the evidence tends to prove that such judgments are fraudulent as against the creditors of L. Harris & Sons, and were so assigned, and hence that the question whether the same are fraudulent and were so assigned should have been submitted to the jury.

Conceding, for the purposes of the case, that these judgments were fraudulent and were so assigned, we are of the opinion that the position of counsel cannot be sustained. There is no evidence in the case tending to show that *Katz* had any notice or knowledge that such judgments were fraudulent. In the absence thereof, he had the right to deal with them as valid, subsisting judgments, which, by the levy of the executions, had become lawful liens upon the stock of goods he proposed to purchase and did purchase. Moreover, there is nothing in the evidence to impeach the fairness, regularity, or validity of the execution sale under which *Katz* purchased the stock. There can be no doubt that, had there been no agreement with Leopold Harris, *Katz* would have taken the absolute title to the stock under his purchase, discharged of any possible claim thereto by any other creditor, and he might afterwards have made just such an agreement with Harris as he did make, without impairing or endangering his title. Being the absolute owner of the goods, he might lawfully do with them as he pleased, and, if he chose to donate them, or an interest in them, to Harris or any other person, or declare a trust in favor of any one therein, or make any improvident contract in respect to them, no person has any right to object. No good reason is perceived why the fact that he made such agreement before he purchased conditional upon his becoming the purchaser at the execution sale, should restrict or affect his rights, especially when he was ignorant of any contemplated fraud on the part of others.

Had any of the stock remained undisposed of after *Katz* had reimbursed himself out of the proceeds of the portion sold for his advances, commissions, expenses, etc., according to his agreement with Harris, if the challenged judgments are fraudulent and void as to the creditors of L. Harris & Sons, probably the creditors could reach such residue in the hands of *Katz* or any other person. But

there was no residue, and the question suggested is not in the case. If, as counsel claim, such residue was to be turned over to Leopold Harris or his firm, still, under the circumstances of the case, *Katz* was guilty of no fraud when he agreed to do so.

In every view of the case it is barren of any proof of fraud on the part of *Katz*, and the court was fully justified in taking the question of fraud from the jury, and directing a verdict for the garnishee.

Some exceptions to the exclusion of testimony were taken by the plaintiff. The view we have taken of the case renders these quite immaterial, and they will not be determined.

*By the Court.*— The judgment of the superior court is affirmed.