McMULLEN et al. v. RITCHIE et al.[1]

(Circuit Court, N. D. Ohio. October 24, 1894.)

No. 4,927.

1. CREDITORS' BILL—NEGLIGENCE IN SETTING UP DEFENSES TO JUDGMENT SUED ON.

Defendant contracted to buy certain bonds and coupons of a corporation of which he was president at the time of the contract and at the time the bonds were issued. Judgment was obtained against him for breach of the contract, and he was again sued on such judgment. In neither of the actions did he allege the invalidity of plaintiff's title, though making various pleas. *Held* that, as against a creditors' bill, he could not set up that the coupons were invalid because severed from the bonds before issued, and because plaintiff had surreptitiously taken them from the corporation's place of deposit, no reason being shown why he had not learned and set up these facts earlier, but that he would be remitted to his remedy at law on the implied warranty as to validity of title.

2. OFFICERS OF CORPORATION—COMPENSATION FOR SERVICES.

When a president and director of a corporation, for whom no salary is provided, of his own accord renders services to advance its interests, being a large owner of its stock and of the stock of other corporations which would be benefited by its prosperity, without expectation on his part of compensation, or knowledge on that of the corporation that he expected payment, he cannot recover therefor or for personal expenses connected therewith for which he had no purpose to charge.

3. CREDITOR'S BILL—MOTIVES OF CREDITORS.

That a creditor who seeks to reach the stock of his debtor in a corporation is induced to do so by other stockholders, with whom he has made plans for future management of the corporation, is no reason for denying him the remedy of a creditors' bill.

4. CORPORATIONS—MISMANAGEMENT BY DIRECTORS—ACTIONS.

Mismanagement by directors gives a right of action to the corporation or a stockholder for its benefit, but not to a stockholder for damages to him individually.

5. SAME.

The mere fact that directors in good faith refuse to enter into a contract for the corporation gives it no right of action.

6. CERTIFICATES OF STOCK—USE AS COLLATERAL—LIMITATION OF AUTHORITY.

When a wife indorses in blank her certificates of stock, and allows her husband to use them as collateral, the burden is on her to show a limitation on his authority to use them, and notice to the creditor of the limitation.

7. DEPOSITION—TRANSACTION WITH DECEDENT.

A deposition of a party as to transactions with another party, taken while the latter is alive, may, though the latter dies without giving his

[1] The opinion in the above-entitled case, being a mere "memorandum for decree," was not intended for publication. It is now published, however, with the consent of Judge LURTON, in view of the importance of the questions decided.

deposition as he could have done, be used when the suit is revived in the name of his executors.

8. WITNESS—COMPETENCY—DECLARATION OF DECEDENT.

A joint maker of a note, though interested in having certain securities held to have been put up as collateral for the note by another maker, may, in a suit to which he is not a party, testify to declarations of the deceased payee relative thereto.

9. SURETY—RIGHTS AS TO APPLICATION OF DEBTOR'S PROPERTY.

A surety's right to have property of the debtor deposited with the creditor as security first applied on the indebtedness cannot be defeated by another creditor levying on it.

10. WITNESS—COMPETENCY—DECLARATION OF DECEDENT.

A party cannot testify to declarations of a decedent which would put a liability on his estate, represented in the suit by executors, decedent not having testified or made a deposition before dying.

Creditors' bill by J. B. McMullen and others against Samuel J. Ritchie and others.

The complainants obtained a judgment on the law side of this court November, 1890, against the defendant Samuel J. Ritchie, for $265,370. Execution issued, and was returned nulla bona. Upon this footing they have filed this bill, to reach the interest of their debtor in certain securities held by the other defendants, Payne, Burke, and Cornell, as collateral security for the indebtedness of Ritchie to them severally. The relief sought is that the indebtedness of Ritchie to each of them be ascertained, and that the collaterals held by each be impounded and sold, and that any surplus after satisfying their several debts be applied in payment of their judgment. Two mining corporations are also made defendants, both organized under the law of Ohio, but having their respective plants in the dominion of Canada. Complainants allege that each of these corporations is largely indebted to Ritchie, and they seek to subject such indebtedness to the satisfaction of their judgment. The defendants Payne, Burke, and Cornell answered and filed cross bills, in which they separately set up the debts due them by Ritchie and the collaterals held as security. They ask that they may have decrees for their several debts, and that the collaterals held by each may be sold and applied in discharge of their debts, and consent to the application of any surplus to the satisfaction of the complainants' judgment. Ritchie also answered the several pleadings, and filed cross bills against each of his codefendants, and against the complainants. He attacks the judgment of complainants for fraud, and seeks to set off his liability to Payne, Burke, and Cornell, by their liability to him on account of alleged fraudulent conduct in the management of the two corporations issuing the stocks held by them as collateral security for the debts due by him to them, and charges that they have entered into a fraudulent conspiracy with the complainants with the view of squeezing him out of the two corporations in which he is heavily interested. He also sets up claims for services rendered by him to the said two corporations, aggregating more than $500,000, and seeks a decree on that account. Under amended and supplemental bills, various other issues were from time to time presented, which need not now be specifically referred to.

Williamson & Cushing, for plaintiffs.

Green, Grant & Sieber, Butterworth & Dowell, Shellabarger & Wilson, and W. S. Kerruish, for defendants Samuel J. and Sophronia J. Ritchie.

Burke & Ingersoll, for cross defendants Stevenson Burke, Henry B. Payne, Canadian Copper Co., Anglo-American Iron Co., and Thomas W. Cornell.

Baird & Voris and Squire, Sanders & Dempsey, for cross defendants William McFarlin, John B. Wright, and Charles Baird, executors of Cornell.

Before LURTON, Circuit Judge, and RICKS, District Judge.

LURTON, Circuit Judge. Memorandum for decree: I shall not undertake to make any statement of the case. The record is one of the most voluminous ever submitted to this court. The pleadings are numerous and much complicated. Much bitterness of feeling exists between the parties, and counsel have suffered themselves to participate in some degree in the feeling and opinion of their clients. The record has been fully examined, and counsel heard both orally and by brief at unusual length. I do not deem it necessary to go into the facts any further than shall be found necessary in the statement of such conclusions as will enable counsel to draw a decree.

The questions to be decided will be stated in such order as shall be most convenient.

1. The attack on the judgment of the complainants, McMullens:

McMullens' judgment: At the October term, 1893, application was made for leave to file an amended and supplemental answer and cross bill by the defendant Ritchie, which, among other things, attacked the McMullens' judgment for fraud, in so far as it rested upon $71,250 of Central Ontario coupons, clipped from the bonds of said company. In the said cross bill, Ritchie alleges that these coupons were not valid, because they had been severed from the bonds by the company before the bonds were issued, and that they had been surreptitiously taken from the company's place of deposit by the McMullens, and were not valid obligations of the said railroad company. In January, 1886, the defendant Ritchie contracted to buy from James B. McMullen and George W. McMullen, the plaintiffs in this case, 210 of the first mortgage bonds of the Central Ontario Railroad Company, with past-due coupons, which had matured the 1st of April, 1885, the 1st of October, 1885, and the 1st of April, 1886. Ritchie, by some contract, bought coupons amounting to $71,250, which were described as having matured prior to January 14, 1885. These were detached coupons, and are those now complained of. Ritchie was to pay for these bonds and coupons described as above the sum of $210,000, and also $40,000 in stock of the Canadian Copper Company; payment to be made on or before the 1st of July, 1886. The delivery of the bonds and coupons, and the payment of the consideration, were to be simultaneous acts. Ritchie failed to make payment; was sued in the Canadian court for breach of contract on the 8th day of October, 1887. The declaration filed in that case set up this contract, averred ownership of the bonds and coupons, and readiness and willingness to deliver same in accordance with the terms of the contract. Ritchie entered his appearance by attorney, and put in pleas. Neglecting to further make defense to the suit, judgment was rendered against him, February, 1888, for the sum of $238,000. Afterwards suit was brought on that judgment in this court, in September, 1888. Various pleas were entered by Ritchie, none of which challenged the validity of the coupons in question. The result of the second suit was that judgment was rendered at the November term, 1890, upon the Ca-

nadian judgment, for $265,370. That case, upon a writ of error, was taken to the United States supreme court, where it is still pending. No supersedeas having been granted, execution issued from this court, which was returned nulla bona. Upon that judgment and nulla bona return, the present bill was filed, October 8, 1893.

The failure of Ritchie at an earlier date to set up the defense which he now, by amended cross bill, seeks to assert, is fatal to his application. The only reason suggested for failure to make this defense is that he had no knowledge at the time of the rendition of the judgment in Canada, and none at the rendition of the judgment in this court, of the fact that the said coupons were without validity, and that they had been surreptitiously obtained by the said McMullens as before stated. There is no averment of diligence whatever. No reason is shown why he did not earlier acquire the same information upon which he now seeks to attack the judgment. Mr. Ritchie was himself the president of the railroad company at the time the bonds were issued, and at the time the contract of 1886 was made, and has continued to be president of that company down to a very late date. In one of his depositions given in this case, where he touches upon this question and upon the McMullens' judgment and the alleged invalidity of these coupons, he says: "I am not now able to state to you when I became aware of the fact, but that I did become aware of it, and I promise to take pains to find out exactly." The McMullens had, jointly with Ritchie, been the owners of this railroad. The contract for the purchase of these coupons described them as coupons "maturing prior to January 14, 1885, and stipulated to be delivered to the McMullens by the contract made in January, 1885." Under these circumstances, it is very extraordinary that several years should have been suffered to elapse without his discovering any improper thing as to the validity of these coupons, or the title of the McMullens to them. Certainly, it is very essential to the jurisdiction of this court, when it is called upon to go behind a judgment rendered at law, that the facts and circumstances which prevented the complainant from making the defense, which was a legal defense, should be fully and thoroughly stated. It certainly was his right to have examined these bonds and coupons, to have inspected them, to have taken their dates and the number of the bonds from which they were clipped; and, looking to the fact that he was president of the railroad company issuing the bonds, it is impossible for him to escape the charge of very gross negligence in this matter, assuming that the defense which he now seeks to make has any merit in it. The inquiry which he did ultimately make of the McMullens as to the coupons covered by this contract does not seem to have been made until some time in the spring of 1893. The McMullens responded to his letter by stating that these coupons consisted of coupons maturing October 1, 1882, and subsequent dates between that time and 1885. At this stage of this case, he should be remitted to his remedy at law against the McMullens,

upon the implied warranty as to the validity of his title to the said coupons.

2. The debts of Ritchie to Burke, Payne, and Cornell:

First. There is no substantial question raised as to the amount due to Burke, and a decree will be drawn for the sums indicated by notes filed by Judge Burke, with interest.

Second. The only controversy as to the debt claimed to be due the Cornell estate is as to a note for $8,000. This note is not produced, nor its loss accounted for. I am convinced that it was taken up, and that the note for $8,640 was given for the old note and interest.

Third. The only controversy as to the indebtedness claimed by Senator Payne against Ritchie is as to a note for $60,000, dated November 8, 1887, payable three months after date, and executed by the Central Ontario Railroad Company to Ritchie, and indorsed by Ritchie to Senator Payne, before maturity. Ritchie's claim is that this note was taken as a payment, and was to be credited by Payne upon Ritchie's obligations to him. This claim is not supported. The weight of evidence is against it. The railroad company was indebted to Ritchie at the time something in excess of $60,000, and this note was executed as part payment of that indebtedness, and has been charged up by the railroad company to Ritchie as a credit upon his account. We think the real purpose of the execution of this note and its indorsement to Senator Payne was to prevent the McMullens, who were then suing Ritchie on account of his large indebtedness to them, from garnishing that money in the hands of the railroad company, and that this note was then turned over to Senator Payne as a mere collateral. The note was practically worthless at the time it was executed, as the railroad company had no means of payment, and there was no practical way of coercing payment. This fact was well known to Senator Payne, and tends to corroborate his evidence and that of Mr. McIntosh that there was no agreement that this note should be taken as an absolute payment upon the amount of Ritchie's indebtedness to him. Ritchie is entitled to have this note sold or collected, if it can be, and the proceeds applied to the payment of Senator Payne's debt; but he is not entitled to have a credit for amount of note thereon as if a payment. The other debts or claims of Senator Payne are allowed, without regard to this collateral.

3. Compensation claimed by Ritchie for services rendered the mining companies, and for expenses incurred by him in their service:

The aggregate amount of compensation claimed by Mr. Ritchie for services of one kind or another to one or other or both the mining companies exceeds $1,000,000. These services may be summarized under the following heads: First, for buying mineral lands now owned by the copper company; second, for buying lands now owned by the iron company; third, for services rendered in getting

nickel ore placed on the free list of the McKinley bill; fourth, services in the matter of extending the uses of nickel as an alloy in armor steel; fifth, services in Europe, Canada, and America in advertisement of the value of the copper and nickel mines owned by the copper company, and endeavoring to bring about a sale of the product and of the property, or a consolidation with other nickel-producing mines; sixth, services in experiments tending to add to the value of the iron mines owned by the iron company; seventh, services in getting certain valuable contracts for the sale of nickel matte to the United States government and to Carnegie, Phipps & Co.; eighth, services in obtaining a proposition from Edison for the erection of a plant for the concentration and desulphurization of the iron ores of the iron company; ninth, services in getting certain propositions for subsidies from Canadian towns in aid of the erection of plants intended to work the ores of the iron mines; tenth, for services in getting switches put down to connect the copper mines with the Canadian Pacific Railway.

With regard to each and all of these claims, it may be said that, when Mr. Ritchie was engaged in the matters for which he now claims compensation, he was officially connected with the companies, either as an officer or director; and neither company had by any resolution or by-law provided for any salary or compensation to any president or director, and that the only salary paid for services rendered by any president or director was a small salary paid the secretary and treasurer, Mr. McIntosh; and that the services rendered by Mr. Ritchie were voluntarily rendered, and without expectation on his part that he would be paid for them, or on the part of either company that he expected payment. There was neither an express nor implied contract upon which he can now predicate a claim for services rendered. That he expected no salary or other compensation is overwhelmingly shown by circumstances, as well as by his direct declarations, established by several witnesses. Most of his claims for services have no equitable basis whatever. For the purchase of the original tract of land containing copper ore he claims $50,000. That tract was bought by him for $14,000. It was bought for himself and Senator Payne. Ritchie took a three-fourths interest, and Payne one-fourth, each paying the purchase money in that proportion. Subsequently, it was conveyed to the copper company, for the consideration of $1,000,000 in the stock of that company. This stock Ritchie thinks was then and is now worth par. This stock was issued to Ritchie and Payne, and to such other persons as they directed. Just why the copper company should now pay him $50,000 for selling to it at $1,000,000 property which cost him $14,000 does not appear. The great bulk of the mineral lands now owned by the iron company consists in a tract of 15,000 acres, in which the company owns an undivided three-fourths interest, the other one-fourth interest being owned by one Coe, who has persistently refused to sell his interest to the company. The interest the iron company owns was conveyed to it by Ritchie, Payne, and one McClaren, each of whom owned an undivided one-fourth interest; Coe, as before-stated, own-

ing the other one-fourth. For their interests, Ritchie and his co-vendors had paid some $14,000. They conveyed their undivided interests to the iron company, in consideration of $1,500,000 paid-up stock of the company; $500,000 being issued to each of them. Subsequently, other lands were bought by Ritchie; sometimes in his own name, and sometimes in association with one or the other of his codefendants. Such lands were subsequently conveyed to one or other of the companies, at large valuations, for stock of the company. The terms on which these conveyances were made were always satisfactory to Ritchie as a vendor, and equally satisfactory to the corporation vendee, it being practically represented and controlled by the vendors. Just why either of the companies should now pay for such services is past finding out on this record. The demand for payment of $100,000, as the value of certain switches put in by the Canadian Pacific Railroad Company to connect the copper company's lands with their line of railway, is equally groundless. The grading seems to have been done by the copper company, the rail and ties being furnished and put down by the railroad company. His claim is that he should be paid for what the railroad company furnished and did. This he puts upon the ground that he had some special influence with the Canadian Pacific Railroad Company, and that what they did was in discharge of obligations to him. What the railroad company did was done for the copper company, and in the interest of the railway company, and for the purpose of developing business for itself. The transaction is one well known to be quite common, and the claim for the value of the track thus put down has no merit in it.

That Mr. Ritchie was extremely active and zealous in endeavoring to make a market for the nickel ores produced by the copper company, and in securing the admission of such ores into this country free of duty, and in efforts to give some value to the iron ores of the iron company by the discovery of some cheap process by which lean ores might be concentrated and deprived of the excess of sulphur which rendered them useless, is most clearly shown. That he spent his time, influence, and money under any employment by either company is not shown. On the contrary, it is shown that he gave his services with no expectation of compensation, other than as the stocks owned by him in the mining companies would be enhanced in value or made salable as a result of his efforts. Another motive moving him to do all in his power to bring about a large operation of these mining properties is found in the fact that he was the president of the railroad company extending from Lake Ontario to the iron company's lands, in the interior. That road was valueless unless it could get freight, and its chief expectation of freight was in the large operation of this iron property. Ritchie was also the owner of a majority of the bonds issued by the railroad company, and of a majority of its shares of stock. It was unable to pay interest upon its bonds. The operation of these iron mines on a large scale would, it was believed, enable it to pay interest on its bonds, and give value to its stocks. Still a stronger explanation of his willingness to aid in every way the

development of both the mining companies is found in the character of Ritchie. As this record shows him, he was a man of great ability, enormous energy, and a towering ambition for great enterprises. As a promoter or "boomer," he seems to be unrivaled; a man of large general information and robust constitution, extraordinarily sanguine, desperately pugnacious, generous as a prince, and possessing no degree of caution whatever. His ambition was to make millions. He believed with all his soul that these mines were of fabulous wealth. On their development he had staked all he had and all he could borrow. Difficulties did not deter him, nor danger affright him. In his mad pursuit of what he believed could be made out of these properties, he could not be restrained by his associates. His determination to dominate led him to give an amount of time to the affairs of these companies largely in excess of any duty by reason of official position. Their caution was, in his judgment, timidity and cowardice. He acted as if he owned the whole property, and, when his advice was rejected or his unauthorized contracts repudiated, he pronounced the conduct of his associates as treasonable, malicious. The court is not particularly impressed with the scrupulousness of his methods, or his reliability as to details of fact. He appears to have been an overbearing, imperious man. That such a man, owning a majority of the shares in each of these companies, should assume to represent them upon all matters of moment, and should endeavor to promote their interests in a thousand ways, is just what might be expected. That he should do so in his own interest, and by reason of his invincible desire for leadership, is precisely what we might look for. That he should wait for employment, or look for compensation when the stake was millions, we should not expect. That he should now turn round and demand pay for all this expenditure of energy, time, and influence is only explainable by the unfortunate result of all his grand schemes and heroic efforts. The conservatism of Payne, Cornell, and Burke was never a barrier to his exertions, or an obstacle to his plans. He never saw difficulties in the way of the development of these properties, and their consolidation with the other great nickel-mining companies of the world. To these ends he devoted himself with the zeal of a crusader. That such an unrestrainable man, of cyclonic energy, zeal, and ability, should now ask pay for each speech he made in favor of free nickel, or day spent in the laboratory of Edison, endeavoring to solve the problem of desulphurization, is wholly due to his final disappointment at results. I am quite clear that, on the whole evidence, there is no evidence which would justify a court in saying that there was an implied agreement for compensation.

4. Expenses:

What has been said as to compensation for services applies equally to his claim for $50,000, spent in the service of these companies. He admits that he kept no account of such expenses. He cannot apportion them between the several corporations, or say in what service he spent any particular sum. He had no purpose to

make a charge for his personal expenses when engaged in the matter for which he now asks compensation. Some of his expenses seem to have been paid. During 1890 he was paid $1,600 on this account. His present demand is purely an afterthought, and has no just basis.

5. Amended cross bill:

First. The application to file amended answer and cross bill, made at October term, 1893, has been again considered in the light of the evidence in the record. The charge of a conspiracy between the complainants, the McMullens, and cross defendants Payne and Burke and Cornell's executors, entered into for the purpose of depreciating the securities held by them as collateral security, with a view of acquiring these securities at low prices, is not supported by the facts of this record. That there has been some concert of action as creditors having securities of the same class, and who are also owners in their own right of large interests in the same enterprises, is more than likely. But that this concert extended to an unlawful purpose, or was intended to maliciously injure Ritchie, is not supported. Whether McMullen was induced to file his creditors' bill by Burke and others, or that his motive in filing his bill was not altogether the offspring of his interest as a creditor, is in no sense a material matter. He has a legal demand, established by judgment. A return of nulla bona entitles him, as a legal creditor, to subject equitable interests of his debtor through a creditors' bill. It is no defense to a legal demand, instituted in the mode and according to the practice of this court, that the complainant is actuated by personal or improper motives. Forrest v. Railroad Co., 4 De Gex, F. & J. 131; Dering v. Earl of Winchelsea, 1 Cox, 319. The motive of a suitor cannot be inquired into. Ex parte Wilbran, 5 Madd. 2; Thornton v. Thornton, 63 N. C. 212. Were it otherwise, nearly every suit would degenerate into a wrangle over motives and feelings. Macey v. Childress, 2 Coop. Ch. 442. Complainants had for years no interest in the several corporations in which Burke, Ritchie, and others were concerned. That they have, in concert with the defendants, who are also creditors of Ritchie, some plans looking to a rehabilitation of these companies, as a consequence of acquiring stocks and bonds now owned by Ritchie, as a means of saving their large demands, is no reason for repelling them from court.

Second. The several acts complained of in the proposed cross bill, and for which Ritchie seeks to hold his creditors Burke and Payne and Cornell liable to him, in so far as they are acts of alleged corporate mismanagement or maladministration, are corporate rights of action, and the remedy is a corporate remedy. Take the instance alleged of the refusal of the contract made by Ritchie of a large sale of nickel ores to the United States government, or the sale to Carnegie, Phipps & Co. of another lot of nickel ore, or the failure of the company to enter into a contract with Edison for the desulphurization of iron ores. All of these instances are contracts with one or other of the mining corporations. If any wrong was done by failing to ratify the arrangements made or proposed by

Ritchie, the wrong was done to the corporation. The injury done by the defendants, if any, was done to the corporation with whom it was proposed to make the contracts. The wrong, if actionable, was one to be remedied by an action by the corporation, or by a shareholder for the benefit of the corporation, upon the refusal of the corporation to sue. A stockholder cannot maintain a suit for the indirect injury done him as an indirect result of an injury to the corporation. This is too obvious to need elaboration. Hawes v. Oakland, 104 U. S. 450; Porter v. Sabin, 149 U. S. 478, 13 Sup. Ct. 1008; Davenport v. Dows, 18 Wall. 626; U. S. v. Union Pac. R. Co., 98 U. S. 610. In the case last cited, the United States was a large creditor of the Union Pacific Railroad Company, by debt not matured; and it was held to have no such interests as would enable it to prosecute a suit against its officers and directors for acts of corporate malfeasance. The leading case on this subject is Smith v. Hurd, 12 Metc. (Mass.) 371. The court said: "An injury done to the stock and capital by negligence or defeasance is not an injury to such separate interest, but to the whole body of stockholders in common." Brinckerhoff v. Bostwick, 88 N. Y. 52; Craig v. Gregg, 83 Pa. St. 19; Allen v. Curtis, 26 Conn. 456. In the last case the court said: "A fatal defect in the plaintiff's petition, both original and amended, is that it seeks no recovery in behalf of the corporation, but seeks a direct recovery of damages for the plaintiff individually; the case stated not entitling him to such recovery." In Howe v. Barney, 45 Fed. 668, and Hirsh v. Jones, 56 Fed. 137, it was held distinctly that a stockholder in a corporation could not maintain an action at law against the officers and directors for malfeasance or maladministration; that the remedy for such a stockholder was a suit in equity for the benefit of such a corporation. This well-settled doctrine is not affected by the fact that these cross defendants held Ritchie's stocks as creditors, and would be liable to him for any willful act whereby the value of his securities were directly affected. The acts complained of may indirectly operate to depreciate these shares, but this indirect result was but a consequence of the supposed injury to the corporation whose shares Ritchie owned. A judgment in a case instituted by one shareholder for the benefit of all others, in a case where the corporation has improperly refused to sue, is one for the benefit of the corporation, and is for equal distribution, if there be no creditors, among all the shareholders, guilty as well as innocent. Dewing v. Perdicaries, 96 U. S. 198; Wallace v. Bank, 89 Tenn. 630, 15 S. W. 448; Howe v. Barney, 45 Fed. 668.

Another decided objection to any recovery against the cross defendants for alleged acts by which the corporation sustained loss lies in the fact that the acts complained of are for the most part disagreements between Mr. Ritchie and the several boards of directors as to the feasibility or wisdom of the several engagements, schemes, or enterprises into which he wished these companies to embark. They all concern the management or policy of the company's assets. They do not involve acts ultra vires done or threatened, or acts of gross negligence in protection of corporate prop-

erty, or acts involving a misappropriation of corporate assets. Mr. Ritchie's judgment was in conflict with the judgment of the board as to what was best to be done. They were questions of expediency as to measures of corporate interest. They present a case where it is sought to have the business judgment of the directory overruled, and the judgment of Mr. Ritchie enforced, through an appeal to the courts. I know of no rule of law which will justify an interference in regard to such matters by a court of justice. If the directors acted in good faith, they are not, as a rule, liable for mistakes of business judgment. The remedy of stockholders dissatisfied with the internal management of corporate affairs is to elect a new board. "The discretion of the directors or the majority of the stockholders as to acts intra vires cannot be questioned by single stockholders, unless fraud is involved." Cook, Stock, Stockh. & Corp. Law, § 684, and cases cited.

The refusal of the cross defendants to sell the corporate property, or to give options for a sale, is not a matter of legal wrong. I know of no rule by which the discretion of an owner jointly interested in property to join in a sale, or efforts to sell, can be complained of by those wishing such a sale. Mr. Ritchie's own evidence does not support the allegations in this regard made by the cross bill. No sale is shown to have been made by him, and no offer was bona fide made for a purchase. He had most exaggerated ideas as to the value of these properties. Some of the cross defendants at times entertained like ideas. That they should refuse to give Mr. Ritchie power to sell them out is not a ground for damages. We find in the record no evidence to support the vehement charges that in refusing to permit Mr. Ritchie to dominate the affairs of these corporations, or to sell them when he wished, or to consolidate with other companies, defendants were actuated by any malicious or improper motives towards Ritchie, or desire to ruin him or squeeze him out. They were his own chosen associates and friends. They advanced to one of the mining companies large sums of money, either as loans or stock subscriptions. They were largely interested in each of them. They loaned Mr. Ritchie enormous sums on the strength of the security of stocks and bonds of these corporations, which moneys he seems to have invested in railway bonds, issued to extend the road in which he was chiefly interested. Any injury done either corporation affected them as much as it did him. They carried him as long as they deemed safe and prudent. His own finances seem to have been locked up in an unprofitable railroad. He makes no case which, in my judgment, could have been aided by his proposed new pleading, and it was properly not allowed to be filed.

6. Mrs. Ritchie's stocks:

McFarlin, executor of Cornell, shows that, of the copper stock shares held as collateral by Cornell, the following certificates appear to have been originally issued to Mr. Ritchie: No. 30, for 500 shares, indorsed by Mrs. Ritchie; No. 209, for 100 shares, in-

dorsed by Mrs. Ritchie; No. 210, for 50 shares, indorsed by Mrs. Ritchie; No. 285, for 51 shares, not indorsed by Mrs. Ritchie.

Certificate No. 36, for 200 shares, held by the executor of Cornell, was a certificate issued to Burke, and is indorsed by him in blank. McFarlin also shows that the executors held certificate No. 102 for 1,939 shares of the iron company stock issued to Mrs. Ritchie, and indorsed by her. The remainder of the iron shares certificates held by these executors do not appear to have been issued to Mrs. Ritchie.

Certificate No. 102, for 1,939 shares iron stock: Mrs. Ritchie, in her answer, claims that this certificate was authorized to be pledged only to secure a note for $14,580.85, bearing date February 6, 1889, and for no other purpose whatever. A note of that description is produced by the executors of Cornell, who also produce a paper bearing date January 28, 1889, signed by S. J. Ritchie, in which he pledges a number of certificates for stock to Mr. Cornell, "as collateral security for any note or notes he has against me, or may acquire." On the 1st day of August, he added a memorandum to the paper above mentioned, in which he permitted the securities above referred to to stand as collateral security for a note for $12,000, that day indorsed by Cornell for him. There is no competent evidence showing any limitation upon Ritchie's authority to use these certificates, indorsed in blank by his wife, as collateral security for any or all of his debts to Cornell. The burden was upon Mrs. Ritchie to show a limitation upon her husband's authority to use her indorsed certificates, and that Cornell had notice of that limitation. A number of papers are exhibited by Cornell's executors, signed by Ritchie, agreeing that the collaterals then in his hands should stand as security for any and all of his indebtedness. The conclusion I reach is that all of Mrs. Ritchie's indorsed certificates of shares in either of the companies are valid pledges in Cornell's hands for all of Ritchie's debt to him.

7. I next come to Mrs. Ritchie's claim to have the coupons and bonds levied on by execution applied in exoneration of her securities held by Cornell:

That the 901 shares of copper stock and 1,938 shares of iron stock held by Cornell as collateral security for Ritchie's debt to him belonged to Mrs. Ritchie is clearly made out. Ritchie also testifies that these shares were pledged to Mr. Cornell by her consent, and that he (Cornell) knew that these shares were the property of his wife. He says that on the 31st day of July, 1890, just before he went with Cornell to Europe, with the view of investigating the nickel industry, Cornell said to him that "a great deal of the collateral that I hold belongs to your wife, and I don't like the idea of relying on that." "Haven't you some other collateral which you can put up?" To which he says that he told him that he had a large lot of coupons clipped from bonds of the Central Ontario Railroad, for interest past due and unpaid, and that he then put up coupons amounting to the sum of $180,000, and five bonds of the same rail-

way, of $1,000 each, for the purpose of protecting his wife's securities against ultimate sale, and for the purpose of having in Cornell's hands securities of his own deemed sufficient to pay the debts which Cornell held against him. He produces from his letter book what he states is a copy of a memorandum made out and put in this second batch of collaterals. This memorandum which he produces is dated July 21, 1892, and reads as follows: "The following coupons of the C. & O. Railway, in separate lots, with the numbers on each lot, have this day been deposited in the First National Bank of Akron." Then follows a description of the 34 packages, amounting in the aggregate to $108,870. The memorandum then proceeds: "In addition to the coupons, I have left with Thomas W. Cornell the following." Then follows a description of the five bonds, which, when added to the previous total, make an aggregate sum of $184,880. The memorandum then proceeds: "These all put in one box in the First National Bank's vault, with my name upon the box." This box of coupons was levied upon by an alias execution issued from this court on the judgment of the McMullens against Ritchie, the levy being made some time in October, 1891. The deputy marshal who made the levy says that he got from Mr. Cornell the box which was in the vault of the First National Bank of Akron, Ohio, and that he there found a memorandum in pencil, which simply stated the contents of each package of coupons. This memorandum contains no contract or agreement of any sort or kind, and a copy is filed in the record. It corresponds to the memorandum produced by Mr. Ritchie as to the aggregate deposit and the number and contents of each package, except that it contains a memorandum of $10,000 of coupons taken out by Cornell. He says there were no C. & O. Railway bonds in the packages. Thus, the contents of the box were some $15,000 less than the original deposit seems to have been. The evidence of Mr. Ritchie leaves it fairly to be inferred that by his consent the $10,000 coupons had been taken out, and the $5,000 bonds applied for some other purpose. On the memorandum produced by Ritchie, in blue pencil, $5,000 appears to be deducted from the aggregate amount shown to have been in the box, which he thinks means that they were taken out for some purpose he does not explain. This leaves a question of fact to be decided as to whether these bonds were deposited with Mr. Cornell as additional collateral for the security of his debts. The complainants insist that Mr. Cornell did not hold them as collateral security, and had no claim upon them except as a mere depositary, and that under their levy and the subsequent appointment of a receiver by this court, upon a bill filed here for that purpose, these coupons should be applied primarily to the discharge of their judgment. Mrs. Ritchie was made a defendant to the original bill in this case, January 11, 1892, and filed an answer same day, setting up the fact that she was a mere surety for her husband to the extent of the copper stock and iron stock heretofore mentioned, and insisting that her right as a surety was that the collaterals held by Mr. Cornell, the creditor, and which belonged to her husband, as principal debtor, should be first applied in payment of Cornell's debts, to the end that her own securities might thus be exonerated. Her in-

sistence is that, if Cornell has suffered collaterals belonging to the principal debtor to be taken from him by the McMullens, her own collaterals in his hands should be exonerated  If Mr. Ritchie's testimony is to be accepted as to the facts of the case, it is very clear that Mrs. Ritchie is entitled to have these coupons applied first to the discharge of Mr. Cornell's debts.   It is also clear that the McMullens, by a mere levy of the execution upon these coupons at the time when they were in the hands of Mr. Cornell, the pledgee, could not defeat Mrs. Ritchie's rights as a surety to this relief.   The supplemental and amended bill filed by the McMullens clearly submits to the court the question as to the right of the complainants to reach and apply these coupons upon their debt.   Mrs. Ritchie, being a party to the original cause, by the consolidation of the original and supplemental bill, is in effect a party to the latter.

But it is insisted that the evidence of Mr. Ritchie as to the purpose and agreement under which this second batch of collaterals was deposited with Mr. Cornell is incompetent, and must be excluded. This objection appears first to have been made upon the taking of the evidence in this cause by the executors of Mr. Cornell, in October, 1893.   Upon the taking of the last batch of depositions in this case, Mr. Ritchie, being again upon the witness stand, was asked concerning the circumstances under which these coupons were deposited with Mr. Cornell.   Upon the argument of the case, a general objection was entered by the executors of Cornell to any evidence of Mr. Ritchie as to any transaction or conversation with Mr. Cornell. It seems to me that this objection is not well taken.   Mr. Ritchie was first examined as a witness by the complainants on the 31st of May, 1892.   In the deposition which he then gave, he substantially stated the same facts elicited more than two years afterwards, in another deposition.   When he was first examined by the complainants, Mr. Cornell was alive, and a party to this litigation.   Mr. Ritchie was therefore, when he then testified, a competent witness as to this transaction.   In June, 1892, Mr. Cornell died, and the suit was revived in the name of his executors, who thereafter interposed the objection heretofore mentioned.   I am of opinion that, inasmuch as Mr. Ritchie was a competent witness at the time that the complainants took his proof in regard to the very matter now under consideration, the deposition thus taken is competent testimony for all purposes.   It was possible for Mr. Cornell to have given his own deposition in reply.   He did not do so at once, and died within perhaps six weeks or two months thereafter, and before testifying in the case.   My opinion is that Mr. Cornell's misfortune, whereby he was ultimately deprived of an opportunity of denying Mr. Ritchie's statements, ought not to, and does not, affect the competency of evidence that should be tested as of the time when the evidence was taken. "The intermediate incapacitation of a witness, therefore, does not exclude his deposition taken when he was competent."  1 Whart. Ev. § 477; Bingham v. Lavender, 2 Lea, 48; McDonald v. Allen, 8 Baxt. 446. I am therefore of opinion that upon the issue between Mr. Ritchie and his wife, the McMullens, and Mr. Cornell, as to whether Mrs. Ritchie is entitled to have these securities, levied on by

the McMullens, applied in her exoneration and protection, Mr. Ritchie was competent to testify at the time this first deposition was taken. Mr. Ritchie's testimony is largely supported by the deposition of I. P. Sperry, taken in November, 1892. He testifies that after this litigation was brought, and while it was pending, Mr. Cornell told him that he was very uneasy about the sufficiency of the collaterals which he had to pay his entire debt; that Ritchie had left with him a box of railroad coupons as additional security for the debt which he held against Sperry, Ritchie & Co., being a note for $63,000, credited with certain payments, and now in the hands of Cornell's executors, and that these packages of coupons had been levied on without his consent and against his objections by the McMullens, and had been taken off by a deputy United States marshal; that he was afraid that Ritchie would undertake to divert them from the purpose to which he had devoted them, and was therefore uneasy. The competency of Mr. Sperry's evidence is objected to, upon the ground that he is one of the makers of the large note referred to. This objection is made by Cornell's executors. Sperry, although interested, is not a party to this cause, and is therefore not within the exception stated. Potter v. Bank, 102 U. S. 163; Bank v. Jacobus, 109 U. S. 275, 3 Sup. Ct. 219.

It is true that neither the memorandum found in the packages containing the collaterals, nor the paper produced by Mr. Ritchie, in terms say anything about the purpose for which these coupons had been left with Mr. Cornell. That these coupons were left with Mr. Cornell as a depositary, and not in the hands of the First National Bank of Akron, is made clear by the testimony of Mr. McFarlin, one of the executors of Mr. Cornell, and an officer of that bank, who states distinctly and positively that the bank had nothing to do with the box; that it was left with Mr. Cornell, and not with the bank, and was placed by Mr. Cornell in the vault, which he had the right to do. Upon the issue as to whether these coupons were left with Mr. Cornell as additional collateral, I am of opinion that both the testimony of Ritchie and Sperry is competent; and that the testimony, taken in connection with the fact that coupons were in the possession of Mr. Cornell and in the box with Mr. Ritchie's name upon it, makes it reasonably satisfactory that Mr. Cornell did hold them as collateral security for the payment of his debts.

The attitude of Mrs. Ritchie as a mere surety is clearly made out by the testimony of Mr. Ritchie, and it must follow that the fact of the levy by the McMullens cannot operate to defeat her right to have these coupons sold in exoneration of her liability as a surety. A decree will therefore be drawn on this point of the case directing that the collaterals held by Mr. Cornell's executors, other than those belonging to Mrs. Ritchie, be first sold, and then a sufficiency of the coupons levied upon by the McMullens to pay any further sum be next sold; and, if any surplus remains after satisfying Cornell's debt, the McMullens will be entitled to such surplus. If, on the other hand, there be a deficiency, enough of Mrs.

Ritchie's securities will be sold to make good such deficiency. Her stocks not sold for this purpose will be delivered to her upon her receipt.

8. Is Cornell's estate liable to the McMullens in consequence of their loss of these coupons to Mrs. Ritchie?

I think that that question has perhaps been sufficiently answered by the ruling that Mrs. Ritchie had the right to pursue these coupons, and that her right had not been lost by reason of the levy. But, independently of that, the insistence of the counsel of the McMullens is that Mr. Cornell waived any right which he had to these securities as collateral in favor of the McMullens. If that were so, it would not necessarily follow that Mrs. Ritchie would be affected by anything which he did. It did not operate to put these securities in the hands of an innocent purchaser without notice. The McMullens occupy no such attitude. They are mere execution creditors, and must stand or fall upon the character of title which Ritchie had to these coupons. They have levied, not upon Cornell's title, but upon Ritchie's title, who was the owner of these coupons. When the levy was made, these coupons were held in pledge by Mr. Cornell, as a security for his debt, and, secondarily, for the protection of Mrs. Ritchie's securities. The McMullens cannot set up an estoppel because they have not been misled to their injury by anything that Cornell may have stated which induced them to believe that these coupons were Ritchie's absolutely, and therefore subject to levy. I am not at all satisfied from the evidence that Mr. Cornell made any distinct waiver of his rights as against these coupons. Mr. McMullen's testimony is perhaps relied upon to show that Cornell disclaimed having any interest in these coupons. I do not think that Mr. McMullen is a competent witness as to that conversation. If Mr. Cornell had testified before dying, and his deposition had been filed in this case, then McMullen would have been competent as an opposite party to have testified concerning any matter which his dead adversary had been examined about. But that is not this case. The McMullens had then taken Mr. Ritchie's testimony, and shown by him that these coupons were deposited as collateral with Mr. Cornell. Mr. Ritchie was not examined at all concerning any conversation between Cornell and McMullen. The effect of Mr. McMullen's testimony, if sufficient to establish the fact which he testifies to, would be, if contention of counsel is sound, to throw a large liability upon Mr. Cornell's estate. It is a case of a living party undertaking to maintain an issue against his dead adversary by detailing a conversation which occurred between them. I think it is incompetent, and I think the objection taken by the executors of Cornell is well taken, and all parts of Mr. McMullen's testimony relating to conversations with Cornell concerning his interest in these coupons must be excluded. But counsel say, if excluded, it is immaterial, because Mr. McIntosh testifies to the same thing. That is a mistake. Mr. McIntosh was present in the room when Cornell and McMullen were discussing

the question of these coupons before any levy had been made. McIntosh says he paid no attention to the conversation, and heard only the fact that they were talking about certain railroad coupons, and that Mr. Cornell said he had no claim upon them. Now, Mr. McIntosh does not testify as to the identity of the coupons that were the subject-matter of the conversation; and, if McMullen's testimony be wholly excluded, Mr. McIntosh's evidence would be almost unintelligible upon this point. The testimony of Mr. Wiman, the marshal, as to what occurred between him and Mr. Ritchie when he made the levy, is very vague and indefinite. I am constrained, upon the whole testimony, to hold, that upon the issue between the McMullens and Cornell's estate, the McMullens, neither upon the facts nor upon the law, have made out a case entitling them to any decree as against Mr. Cornell's estate.

9. The purchase of the Vermillion mine:

Without stating the facts of this matter, I am of opinion that Ritchie has no just demand against Cornell's estate for any part of the shares of the copper company issued to Cornell for the Vermillion property.

10. It is next insisted, by both Ritchie and his wife, that on the 24th day of January, 1890, Mr. Ritchie assigned and transferred to Cornell, by way of additional security, certain collaterals held by the savings and loan bank, to secure it in a loan theretofore made to Ritchie, for which it held Ritchie's note for $171,500. The collaterals held by the bank were supposed to exceed in value the amount of the bank's debt. In support of this insistence, Mr. Ritchie produced a paper signed by himself alone, bearing date as of January 29, 1890, purporting to transfer all of his interest in the securities belonging to him and held by the said bank, as additional security for the payment of a note of Ritchie's held by Cornell at that time. This paper, thus produced by Ritchie, purports to be subject to an assignment made to Henry B. Payne. Ritchie was examined as to this matter by the counsel of Cornell's executors, and he testifies that on the 29th of January, 1890, he, in consideration of a certain indorsement renewed that day by Mr. Cornell, and in consideration of certain other obligations executed in his favor by Cornell, had drawn up and executed three copies of an assignment, one of which he filed in evidence. He testifies that the other two copies were delivered to Mr. Cornell. He also testifies that the subsequent transfer of these same collaterals to Senator Payne, made on the 10th of March, 1890, and conditioned that he would take up and pay off Ritchie's note for $171,500, due to the said savings bank, was made with full knowledge of the previous assignment of January 24, 1890, to Cornell, and was made subject to it. In support of the alleged assignment to Cornell, it is shown that Cornell paid one installment of interest on the 29th of January, 1890, on Ritchie's note, held by the bank. Mr. McIntosh testifies that on the 6th of March, 1890, Mr. Cornell informed him that he had paid one installment of interest for Ritchie, under the belief that Ritchie had executed to him an assignment of the bank's collateral, but that he would pay no more

interest, for he had that day discovered that Ritchie had made no such assignment. Upon receiving this information, Mr. McIntosh, who was the private secretary of Senator Payne, wrote to his principal at Washington, under date of March 6, 1890, advising Senator Payne that, in view of the McMullen suit and the certainty that those assets would be levied upon in case there was a judgment in favor of the McMullens, it would be best for him to purchase outright the securities owned by Ritchie, and held by the savings and loan bank, and then pay off the Ritchie note. He told him of the conversation with Cornell, who had said to him that Ritchie had made no such assignment to him as he had supposed, and under which he had acted when he paid the one installment of interest. Long prior to either of these alleged assignments, and on the 10th day of September, 1887, Ritchie assigned to Senator Payne, as collateral security, all of his interest in the collaterals held by the savings and loan bank. The reference in his subsequent assignment of some collaterals to Cornell is to this early assignment.

The bank had power of attorney authorizing it to sell, upon default in payment of interest, these securities. A sale under this instrument would have thrown upon the market a very large amount of securities that Senator Payne was interested in upholding. On the 10th of March, Cornell saw Senator Payne, at Washington, and executed an absolute transfer of all his interest in these securities, in consideration that Payne would pay off his note of $171,500, payable to the bank. This Payne did, and took up the securities, and now holds them. Ritchie insists that he informed Payne, at the time of this transfer of the securities to him, of the previous transfer to Cornell. This Senator Payne absolutely denies, and insists that the only information he (Payne) had upon this subject was the information imparted to him by McIntosh as to Cornell's admission. Payne did not owe the $171,500 note. There were two notes, one for $10,000, and one for $25,000, held by this bank as security for the payment of this note, and this was his only interest in that transaction. According to Ritchie's own admission, these securities were held, not only for the benefit of the bank, but to secure Payne's indorsements upon the two small notes held as collateral to the large one. Payne's conduct was that of one who believed that, by paying off that note, he would obtain these securities unaffected by a liability for any other debts due from Ritchie. It is exceedingly improbable that Senator Payne would have paid this note off if he had understood that he was taking these collaterals subject also to a prior lien in favor of Cornell. The circumstances all tend to support Senator Payne's denial that he was ever informed by Ritchie of the actual existence of any such assignment to Cornell. It is clear that, as between Cornell and Payne, Cornell's estate would not be permitted to set up the assignment which had been repudiated to Mr. McIntosh, and which was communicated and acted upon by him to Senator Payne. Upon this point, therefore, my conclusion is that Senator Payne is entitled to prior payment out of these assets, and to have satisfaction of his claims out of these collaterals, as well as those he already had.

It is well to observe right here, as to the actual truth of any such

transfer, that it does appear that Ritchie and Cornell, together, went to the office of Mr. Allen, a lawyer, and had him draw up a transfer of these securities. The paper exhibited by Mr. Ritchie is a copy of the transfer then drawn up. Mr. Allen says that neither of these copies, of which he says there were two, on type-writer paper, was signed by Ritchie, and there was no delivery of either one of them to Mr. Cornell; that, when he had printed two typewritten copies on the typewriter, he handed them both to Mr. Ritchie, who took them; and that he and Cornell then went off together. No such paper was found among Cornell's papers, after his death, by his executors. It is likely that Cornell expected that Ritchie would deliver to him one of these transfers, and that, upon the faith of that, he paid the installment of interest of some thousands of dollars; but before the second installment fell due, Ritchie having never concluded the transfer, he refused to make any other payment, and announced to Mr. McIntosh that he had been deceived by Mr. Ritchie in the transfer, and that it had never been completed. Under all the circumstances, the evidence is not sufficient to my mind to establish the fact that this transfer was ever executed by a delivery of a signed copy to Mr. Cornell, or by giving notice to the bank. Cornell stated to several persons that these collaterals had not been assigned to him, and his whole conduct, with the single exception of the payment of the installment of interest, is that of a man who had no claim upon these assets. My solution of it is that Ritchie intended to transfer these collaterals to him, but, in the thousand matters that were then troubling him, it escaped his attention. I cannot conceive that he had it in mind when he made the subsequent assignment, on March 10th, to Senator Payne.

11. The McMullens will deliver the coupons and bonds sold to Ritchie, and for which they have obtained judgment, to Irvin Belford, clerk of this court, who is hereby appointed special commissioner, and take his receipt. The securities thus turned over will, after due advertisement (the terms of which to be hereafter stated), sell them separately from any and all other coupons; and after deducting a reasonable compensation for his services as commissioner in making the sale, and a fair proportion of the cost of advertising, he will pay over the entire proceeds of sale to the complainants, crediting same upon their judgment. Each of the defendants holding collaterals will likewise turn over their said collaterals to said Belford, as commissioner, taking his receipt. Said commissioner will, after advertisement, sell at public sale each lot of collaterals, keeping proceeds separate. In regard to the collaterals held by Cornell's estate, he will first sell the securities belonging to Samuel J. Ritchie, including the coupons and bonds levied on by complainants, and now in the possession of ———, as receiver, who, for this purpose, will place same in the hands of said Commissioner Belford. If the sale of Ritchie's collaterals is insufficient to pay the debt of Cornell, and a just proportion of all costs of the cause, and his own compensation, he

will then sell a sufficiency of the collaterals owned by Mrs. Ritchie to pay any deficiency. If, however, there be enough of the proceeds arising from the sale of Ritchie's collaterals to pay Cornell's debt, and a surplus, he will pay such surplus on the McMullens' judgment. He will sell the Payne and Burke collaterals separately. After applying a just proportion of the proceeds of each in discharge of the costs of the cause, and his own expense and commissions, he will pay remainder from sale of Payne's collaterals to Payne, and remainder from sale of Burke's collaterals to Burke, on their respective debts. If, in either case, there be a surplus, then he will pay such surplus on the complainants' debt as far as necessary; balance to Ritchie. He will in each case sell the said collaterals in such lots as, in his judgment, will tend to bring the largest price. The sales will in each case be for cash; creditors paying in such proportion of money as the commissioner shall require for expenses and costs, up to the amount of their respective claims. If the counsel for all parties shall agree upon a mode of sale, and upon terms of sale, differing from those here fixed, they may do so, and so enter the decree. The commissioner will make no sale until 90 days after decree is entered, within which time, if the defendant Ritchie shall pay off the several amounts due to complainants and to Burke and Payne and Cornell, and all the costs of the cause, the commissioner will turn over to said Ritchie the collaterals so ordered sold; but, if he fails to pay off the said indebtedness and costs, he will then advertise his sale in one or more papers published in London, England, Toronto and Sudbury, Canada, Cleveland, Ohio, and New York, N. Y., using his discretion as to the number of papers in each city, and the number of insertions in each paper, except as to Cleveland, where he will advertise his sale for 60 days, in each of the two leading daily papers. The commissioner will also prepare a circular letter, describing the shares and bonds to be sold, and cause same to be mailed to such persons and firms and corporations as he shall have reason to believe may be interested in such securities. His sale will be made at the door of the Federal building at Cleveland, between 11 o'clock a. m. and 3 o'clock p. m. of the day of sale, and may be adjourned to such other day or days as he shall find advisable. He will make full report of his proceedings under this order to the following term of the court.

The costs of the cause, including receiver's costs and commissioner's costs and all expenses of sale, will be paid out of the proceeds of sale, being proportioned between each separate fund.