PATON et al. v. NORTHERN PAC. R. CO. et al.

(Circuit Court, E. D. Wisconsin. July 22, 1896.)

1. INSOLVENT CORPORATION—REORGANIZATION—EXCLUSION OF GENERAL CREDITORS.

A plan for the reorganization of an insolvent corporation which gives stockholders an interest in the new organization upon agreed terms, but does not include general creditors, or tender them an opportunity to join therein, is not invalid, unless the scheme is one to give to stockholders that which should go to creditors, or one to defraud creditors.

2. SAME—INCLUDING STOCKHOLDERS IN REORGANIZATION—FRAUD ON CREDITORS.

Where stockholders of an insolvent corporation were permitted to participate in a reorganization thereof, and for their stock were given an equal number of shares in the new organization upon the payment of a given sum per share, and it appears that such sum is largely in excess of the market price of such new stock, it cannot be said that including stockholders in such reorganization was a fraud upon general creditors.

3. SAME—EQUITY—PLAN OF REORGANIZATION—OFFER TO ACCEPT.

A bill by general creditors of an insolvent corporation which seeks to set aside a decree for the sale of the corporate property, and enjoin the sale and the carrying out of a plan of reorganization, and asks that the court formulate a new and just plan of reorganization, giving to the general creditors their appropriate proportion of bonds or stock, and determining the terms upon which that proportion shall be awarded, is wholly without equity, where there is no offer by complainants to enter into or be bound by any plan of reorganization.

The complainants, holders of 5,498 bonds, of $1,000 each, issued by the Seattle, Lake Shore & Eastern Railway Company, and claiming to be general unsecured creditors of the Northern Pacific Railroad Company, by virtue of the latter's guaranty of the bonds mentioned, filed their bill setting forth the various mortgages issued by and upon the railroad of the Northern Pacific Railroad Company, and the proceedings instituted in this court in the year 1893, to foreclose the second, third, and consolidated mortgages upon the road, resulting in a decree of foreclosure passed by the court on the 27th day of April, 1896, directing a sale of the property to satisfy the amount found due upon the various mortgages sought to be foreclosed.

The bill alleges that such foreclosure decree was passed by consent, pursuant to a conspiracy, plan, and agreement published March 16, 1896, by which the trustee and bondholders under the various mortgages conspired with the railroad company and its stockholders to exclude general creditors from participation in the assets of the insolvent Northern Pacific Railroad Company, and to award to stockholders of the company, in proportion to their former holdings, new rights and privileges, which the bill charges should belong to the general creditors of the road, and that such general creditors were excluded from participation in the plan of reorganization. It was charged that such plan and agreement was a fraud and wrong upon general creditors, because it gave to stockholders, upon the payment of specified sums of moneys, the right to participate in the reorganization, which was a valuable right, and one which could not legally be reserved for the stockholders until it should first be offered to and declined by general creditors, and that it also was a combination to prevent the general creditors from bidding at the sale under the decree, thereby preventing competition between stockholders

and secured creditors. The bill prayed that such plan and agreement of reorganization might be declared to be in fraud of the rights of the general creditors, and that all persons may be enjoined from pursuing such plan or from any purchase of the railroad thereunder; that the decree might be opened, and the general creditors adjudged to be entitled to all rights given to stockholders by such plan and agreement; that the court would formulate and provide a just and fair plan for distribution of the securities of any new corporation which might be formed under such plan and agreement, and which might purchase the railway; that the proposed sale under the decree should be enjoined; and that the defendants who constituted the reorganization committee should be enjoined from issuing to stockholders of the railroad company any securities of the new company until they should have been first offered to and declined by general creditors. The Northern Pacific Railroad Company demurred specially to the bill, upon the ground that the complainants are not judgment creditors; that the alleged guaranty of the bonds of the Seattle, Lake Shore & Eastern Railway Company was without consideration and void. Others of the defendants demurred generally to the bill. A motion for injunction pursuant to the prayer of the bill came on for hearing, at which time there was presented for the reorganization committee an affidavit controverting many material charges in the bill. At the hearing of the motion, the application for an injunction restraining a sale under the decree was abandoned by the complainants' counsel, and the motion limited to an order restraining the reorganization committee from delivering to stockholders of the Northern Pacific Railroad Company any stock of the new company to which they might become entitled under the provisions of the plan of reorganization.

Peckham & Stark, for complainant.
Silas W. Pettit, for N. P. R. Co.
W. N. Cromwell, for Adams.
J. G. Flanders, for the Loan & Trust Co.
Stetson & Morawetz, for Morgan.

JENKINS, Circuit Judge (orally).     It is proper to look at the situation of this road, and the relative position of the parties with respect to their securities and claims, before proceeding to remark upon the legal aspect which the case presents.

The proceedings in behalf of the trust company to foreclose certain mortgages upon the road were commenced in the year 1893, since which time this road and its property have been under the management and in the possession of the receivers of the court.    At the time of the publication of the plan of reorganization, the property of the road stood substantially, if not accurately, in this position:    There was a first mortgage of $41,879,000; there were the underlying mortgages upon the Missouri Division of $1,815,500; and upon the Pend D'Oreille Division of $357,000,—making $44,051,500 in amount of mortgage liens superior to the mortgages sought to be foreclosed.    The principal and interest to the date of the decree of the second mortgage was $23,033,-738.80; of the third mortgage, $13,606,212.70; of the consolidated mortgage, $71,643,703.63.    There were also outstanding receivers' certificates amounting to $5,000,000, which were liens upon this road prior to either of these mortgages for such amount as might remain after the application of collaterals.    Without reference to the receiver's certificates, there was a debt upon this railroad superior to any claim of the preferred or common stock, and superior to any claim of general creditors, of $152,335,155.13.    The fixed charges amounted to $10,905,690.    The net income under the receivership for the year 1894–95 (a fair year) was $6,015,846.62, leaving a deficit to meet the

fixed charges of nearly $5,000,000. So that it may well be said, as was said and is asserted over and over again in the record of the foreclosure proceedings, that this railroad company was insolvent.

The plan of reorganization proposed that, upon the purchase of this road upon the sale,—if the syndicate should become the purchaser,— there should be issued $130,000,000 of 4 per cent. 100-year gold bonds, secured by first mortgage; $60,000,000 of 3 per cent. 100-year gold bonds, secured by a second mortgage; $75,000,000 of preferred stock, and $80,000,000 of common stock; and by the plan, after payment of some small amount of cash, the holders of the first mortgage bonds assenting to the arrangement should have $1,350 in new bonds for each $1,000 of old bonds, and that amount, undoubtedly, in view of and because of the reduction in the rate of interest. The holders of the second mortgage bonds should take 118½ per cent. in 4 per cent. bonds for the old bonds and accumulated interest, and 50 per cent. in preferred stock. The holders of the third mortgage bonds should take 118½ per cent. in 3 per cent. bonds in lieu of the old bonds and accumulated interest, and 50 per cent. in preferred stock. The consols should receive 66½ per cent. in the 3 per cent. bonds, and 62½ per cent. in preferred stock. Provision was also made for the retirement of the bonds held by the Northwest Equipment Company, and of those pledged for collateral trust notes and for dividend certificates issued under certain resolutions of the old board of directors with reference to a supposed surplus or dividend belonging to preferred stockholders. The preferred stock of the old company should receive 50 per cent. in new preferred stock, and 50 per cent. in new common stock, in consideration of the holders of it paying $10 per share. Holders of the common stock should receive 100 per cent. in new common stock upon paying $15 per share. The estimate of the plan was that, by the abatement of interest, the amount of fixed charges, now $10,905,690 annually, would be reduced to $6,052,600 annually. The property up to this time, at the best, could be relied upon to realize not to exceed $7,800,000 a year.

It is no doubt true, as ruled in Railroad Co. v. Howard, 7 Wall. 392, that the disposition of the property of a corporation among its stockholders, without providing for the payment of the debts of the corporation, is a fraud upon creditors. It, however, is essential to look at the facts of each case in order to accurately apply the principle enunciated; for, if the contention of counsel for complainant be correct, all agreements of reorganization of bankrupt corporations which fail to give all creditors of the corporation an interest in the reorganization, or which fail to satisfy the debts of the corporation, and which accord to stockholders of the old corporation upon any terms an interest in the new corporation, are inhibited by the law, and void. If such conclusion result from the decision in the Howard Case, the result must prove disastrous, uprooting past reorganizations of great magnitude, and seriously crippling, if not preventing, any future reorganization of bankrupt corporations. In the Howard Case the property of the Mississippi & Missouri Railroad Company, an insolvent corporation, was incumbered by five mortgages. The Chicago & Rock Island Railroad Company proposed to purchase of the insolvent corporation its

railway for the sum of $5,500,000, contingent upon obtaining title thereto forthwith. The only mode of accomplishing this was by the foreclosure of one or more of the mortgages. Thereupon, at a meeting of the bondholders under the various mortgages, and of the holders of stock of the insolvent company, the offer was accepted; the bondholders agreeing to take a certain percentage of their bonds in satisfaction of the debt, and in discharge of the lien under the mortgages, the holders of stock agreeing to receive a percentage of the price in satisfaction of their claim. Foreclosure proceedings were commenced, and prosecuted to effect, in aid of and in consummation of that agreement. The bondholders abated the sum due them for a specified cash payment or payment in what to them was equivalent to cash; and, before the division among the stockholders of the percentage reserved to them, certain judgment creditors sought to have applied upon their debts the amount awarded to the stockholders. The court sustained this contention, upon the facts disclosed. Mr. Justice Clifford, delivering the opinion of the court, observed (page 414):

"Holders of bonds secured by mortgage, as in this case, may exact the whole amount of the bonds, principal and interest, or they may, if they see fit, accept a percentage as a compromise in full discharge of their respective claims; but, whenever their lien is legally discharged, the property embraced in the mortgage, or whatever remains of it, belongs to the corporation. Conceded fact is that the property purchased of the railroad was sold for the considerations specified in the record, and that the mortgage bondholders discharged their lien for 84 per cent. of that amount, and that the residue of the purchase money remained in the hands of the purchaser, discharged of the lien created by the mortgages."

There, as not here, the agreement of sale to the purchasing company was made before the foreclosure proceedings, the latter being merely incident to and in aid of the agreement of sale. It is also true that the property was incumbered beyond its value; but there, as not here, by agreement, the property of the company was to be divided among the bondholders and stockholders upon an agreed basis, the claims of the bondholders being compromised, abated, and discharged in full. Here the proposed plan is to take effect in the event of purchase under a decree of sale; and it may be assumed that the decree was entered by consent of all parties interested in furtherance of the plan of reorganization. And it may also be assumed that, upon the sale to be had, the reorganization committee would become the purchaser; for as expressed by the supreme court in Railway Co. v. Gebhard, 109 U. S. 527, 549, 3 Sup. Ct. 371:

"It rarely happens in the United States that foreclosures of railway mortgages are anything else than the machinery by which arrangements between the creditors and other parties in interest are carried into effect, and a reorganization of the affairs of the corporation under a new name brought about."

So that the question is presented whether any plan of reorganization can be sustained which does not comprehend the protection of the rights of general creditors of the corporation; or, in other words, whether bondholders have a right to agree with stockholders upon terms which may be agreed upon to give the latter an interest in the new corporation, without including creditors in such plan of reorganization, or at least tendering them an opportunity of joining therein. I fail to perceive any just reason why, in the absence of fraud or oppres-

sion, such arrangements should not be upheld in a court of equity. It was competent for these bondholders to exclude stockholders from any agreement. It was also competent for them to exclude creditors. The bondholders, under different mortgages, could agree among themselves, without reference to creditors or stockholders; and in case of agreement with stockholders, unless the scheme is clearly one to secure to the stockholder that which should justly go to the creditor,—unless it can be said that it was a scheme to defraud creditors,—I perceive no reason which would justify denunciation of the plan. To the contrary, such plans of reorganization have met with general approval, because they tend to avoid sacrifice and loss, and are beneficial to the public. Robinson v. Railroad Co., 28 Fed. 340; Mackintosh v. Railroad Co., 34 Fed. 582; Central Trust Co. of New York v. United States Rolling-Stock Co., 56 Fed. 5, 7; Pennsylvania Transp. Co.'s Appeal, 101 Pa. St. 576.

Can it fairly be said that any fraud here was perpetrated upon the creditors? What was the position of the stockholders? This property was incumbered to the amount of $152,000,000. There is no allegation in this bill, nor is there information within reach of the court in the record of the foreclosure suit, which shows the actual value of this railroad property; but it is clear that, at the time of the reorganization plan, the net earnings of the road were largely insufficient to pay its fixed charges, and that there was a continual annual deficit in that respect. So that, looking at the interest of the stockholders in the Northern Pacific Company at the time this plan of reorganization was proposed, can it properly be said that the stock had any actual appreciable value? It might, under certain contingencies, have a certain market value for the purposes of control, if it could control, but certainly not with reference to the control of this property, which was within the custody of the court for the purpose of foreclosing the mortgages and protecting the creditors of the road. Under these circumstances, this reorganization agreement proposes that the stockholders might have common stock in the new company upon paying $15 a share. What would they get? If the court has accurately placed these figures, there will necessarily be, under present conditions, not more than sufficient income to meet the net fixed charges, even under the plan of reorganization. What, then, was the hope? That business would revive; that the country would recover from the panic of 1893; and, with the revival of business, the road would be able to meet its fixed charges, and in the time to come, possibly,—though rather doubtfully, because, I think, experience has shown there are but few, if any, roads west of the Mississippi river that have been known to pay a dividend on their common stock,—there might be realized some dividend upon the common stock. But for that possible hope, coupled, perhaps, with anticipated participation in the control of this road that might come in time, these stockholders, in order to acquire new stock, must pay $15 a share. That was not for the property of the Northern Pacific Company, but in the hope that in the future they might, in view of the possible revival of business and the growth of the country penetrated by the railroad, realize some profit upon the new, and recover the loss upon the old, investment; and that they have

entered upon a doubtful speculation, and have yet received, and are likely to receive, nothing, is shown by the fact appearing in the record, that the stock, or the interest of the stockholders upon which $10 a share has been in fact paid, brings to-day less than $6 in the market.

This bill was filed by general creditors of the Northern Pacific Company to attack this decree. It alleges that this arrangement, which in the bill is termed a "conspiracy," was made without the opportunity afforded to the general creditors to participate in the reorganization, and to have awarded to them the interest of the stockholders. In other words, it is claimed—and that is the broad claim of this bill—that when a railroad company is insolvent, and its mortgages are sought to be foreclosed, and reorganization is attempted, unless the bondholders shall take into their plan of reorganization stockholders and creditors, such a reorganization is invalid. This bill demands that this decree shall be set aside, and that it shall be adjudged that the general creditors of this company are entitled to all the rights which by the reorganization plan are given to the stockholders, and that the court shall formulate and provide a fair plan for the distribution of the securities of any new corporation which may be formed by the bondholders or other purchasers of the property of the Northern Pacific Railroad Company pursuant to sale under any decree to be passed, and provide for just and fair execution of such agreement and distribution of securities among the various parties entitled thereto. In other words, it is suggested by this bill that, upon any plan of reorganization, the parties in interest are not to be at liberty to contract with each other; but that the plan of reorganization should be formulated and imposed upon the parties by a court of equity. Courts are created for the purpose of enforcing contracts which parties have made, not for the purpose of making contracts for parties. It would be more than doubtful, if power was conferred upon a court to make a contract for parties, whether it could make as fair and just and equitable a contract as could the parties themselves.

There is another peculiar feature of this bill. The complainants come into equity asking that they be substituted to all the rights of such stockholders as assent to and participate in this plan of reorganization. It is a familiar principle that he who comes into a court of equity asking equity should be willing to do equity. These holders of common stock who have entered into this plan of reorganization, in order to acquire any right whatever, in order to have a possible, but remote, contingency of receiving anything in the future, were obliged to pay $15 a share for each share of stock. If the theory could be upheld that the complainants have the right to be substituted in the place of the stockholders under the plan of reorganization upon payment of the assessment of $15 a share, it is to be observed that the complainants do not even offer by their bill to pay the stockholders the sums which have been paid upon their subscription to this plan of reorganization. While it is true, as observed by counsel, that the market price of stock is not always a just and true criterion of its value, that the market may be inflated to-day and depressed to-morrow, and is subject to manipulation, still, it remains true that the market value, as indicated by sales, is to some extent an indication of the real value

of the property. It may therefore, not without reason, be said that the omission in this bill of any tender to do equity, or of any offer to pay the price demanded for this common stock as a condition of participating in the plan of reorganization, is because, as shown by this record, the share of stock upon which $10 has been paid to-day, notwithstanding the assured success of the plan, commands less than $6 in the market. This bill, as was observed, is not to carry out this plan of reorganization, substituting the general creditors for the stockholders, but desires and demands that the court shall formulate a plan of reorganization, giving to the general creditors their appropriate proportion of bonds or stock, and determining the terms upon which that proportion shall be awarded; and it does not offer even to enter into or be bound by any plan of reorganization, but simply that there may be tendered to creditors an opportunity of entering into a plan of reorganization without any sort of obligation or offer upon their part to enter into it, to assume its obligations, or to pay any money. The result would be, if the prayer of this bill were granted, that this reorganization plan would be set aside, and the court would require bondholders and stockholders to reform the plan of reorganization so as to embrace creditors or tender to them an opportunity to join upon such terms as might be thought proper, with leave to the general creditor to accept it or not, as he might think best.

A careful examination of this bill and of the record, in the light of the knowledge which the court has of this whole transaction, satisfies me that the bill is without equity. This conclusion renders it unnecessary for the court to consider the other questions that were argued at the bar,—whether a general creditor, not having placed his claim in judgment, could maintain such a bill as the present, or whether the contract under which the complainants claim to have become general creditors of the company was ultra vires the corporation. The motion will therefore be overruled.