FARMERS' LOAN & TRUST CO. et al. v. LOUISVILLE, N. A. & C. RY. CO. et al.

In re LOUISVILLE TRUST CO.

(Circuit Court, D. Indiana. July 7, 1900.)

1. RAILROADS—FORECLOSURE OF MORTGAGE—REORGANIZATION AGREEMENT IN FRAUD OF CREDITORS.

A decree foreclosing mortgages on a railroad cannot be impeached because of a prior agreement between a committee of bondholders and officers and directors of the company to form a reorganized company, and purchase the property at the sale, and thereby relieve it from the unsecured debts of the company, even though it is a part of such agreement that stockholders of the old company may obtain stock in the new on payment of a small difference, where the mortgages are due because of default in the payment of interest, and the company is in fact insolvent, and it does not appear that the trustees who brought the suit are parties to or had knowledge of the agreement, or that the default which matured the mortgages was due to such agreement.

2. SAME—PROTECTING INTERESTS OF STOCKHOLDERS—LEGALITY.

A plan of reorganization made by railroad bondholders for the purpose of purchasing the property at foreclosure sale, and by which stock-

holders in the old company are permitted to convert their stock into stock in the new company on payment of a stipulated difference, is not for that reason fraudulent and void as to general creditors of the old company, where it does not appear that any of the stockholders, as such, were parties to the plan; that it caused or in any manner affected the foreclosure proceedings, or deprived the general creditors of any rights, so that whatever rights, if any, are secured to the stockholders are at the expense of the bondholders, and not of the unsecured creditors.

3. SAME.

A creditors' suit was commenced against a railroad company, in which a receiver was appointed, on a showing of the insolvency of the company, the commencement of attachment suits against it, and the threatened institution of others, which would result in destroying the unity of the property. Subsequently default was made in payment of interest on the company's bonds, and suits were instituted by the trustees in the mortgages for their foreclosure, which were consolidated with the prior suit. After default on the bonds, but before the filing of the bills for foreclosure, a committee of bondholders was appointed, who devised a scheme of reorganization, in pursuance of which they made a contract with a syndicate, which included some of the officers of the company, by which such syndicate agreed to purchase for cash certain bonds and stock of the new company, and to deliver certain of such stock to stockholders of the old company, who should elect to exchange their stock therefor and to pay a stipulated sum per share in cash. It did not appear that any stockholders were parties to such agreement, except such as were also bondholders. The plan was carried into execution, and the bondholders' committee purchased the property at the sale under foreclosure decree for a sum much less than the mortgage indebtedness thereon. The company was unquestionably insolvent, and it was not shown that such arrangement in any way affected the foreclosure proceedings; nor did it appear that the stock in the new company received by the stockholders in the old was of any greater value than the cash payment required to be made by them therefor. *Held*, that such arrangement did not constitute a fraud upon the unsecured creditors of the old company, nor operate to their injury, so as to entitle them to place the property again in the hands of a receiver, to be operated for their benefit until their claims were discharged.

On Exceptions to the Report of the Master.

St. John Boyle, Swager Sherley, and Shackelford Miller, for petitioner.

Francis Lynde Stetson, G. W. Kretzinger, and E. C. Field, for defendants.

WOODS, Circuit Judge. The mandate of the supreme court in this case was:

"To set aside the confirmation of sale. To inquire whether it is true, as alleged, that the foreclosure proceedings were made in pursuance of an agreement between the bondholder and stockholder to preserve the rights of both and destroy the interests of unsecured creditors, and that, if it shall appear that such was the agreement between these parties, to refuse to permit the confirmation of sale until the interests of unsecured creditors have been preserved, and to take such other and further proceedings as shall be in conformity to law." 174 U. S. 674, 689, 19 Sup. Ct. 827, 43 L. Ed. 1130.

Upon the filing of this mandate, on July 7, 1899, the petitioner, the Louisville Trust Company, was granted leave to file and filed an amended and supplemental petition; and thereupon it was ordered, on motion of that company, that the order of March 10, 1897, "confirming the sale made under the decree in this court," be set aside, and that the petition and amended and supplemental petition, and

any answers thereto, required to be filed within ten days, be referred to James M. Winters, Esq., as special master, "to take proof and inquire whether it is true, as alleged, that the foreclosure proceedings were made in pursuance of an agreement between the bondholder and stockholder to preserve the rights of both and destroy the interests of unsecured creditors, and that he shall further take such lawful evidence as may be produced before him by any of the parties to this cause in relation to the matters set up and alleged in the amended and supplemental petition, and shall make report to the court of his findings thereon, together with the evidence so taken." On April 4, 1900, the report was filed, embracing a finding of facts and a statement of legal conclusions. The report shows an agreement of counsel "that, in the order authorizing and directing the special master to report the facts with his findings, the word 'findings' is intended to cover both findings of fact and conclusions of law." The fifteenth finding of fact is as follows:

"(1) There was no fraud or fraudulent intent or fraudulent conspiracy on the part of the trustees, the bondholders, the bondholders' committee, the stockholders, or the New Albany Company; (2) there was no conspiracy; (3) there was no damage to the unsecured creditors; (4) there was no unlawful advantage to the stockholders."

Five conclusions of law are stated, as follows:

"First, the petition has not been sustained by the proofs; second, the supplemental petition has not been sustained by the proofs; third, the answers have been fully sustained by the proofs; fourth, the petition and the supplemental petition should be, and are, denied and dismissed, with costs; fifth, the sale as reported by the special master should be confirmed by a reinstatement of the former decree of confirmation, and by the precedent vacation of the decree of July 7, 1899, setting aside the decrees of confirmation."

The evidence is contained in two printed volumes,—one of "Depositions," and the other of "Exhibits." On May 3d the Louisville Trust Company filed exceptions to the report, alleging the following errors:

"(1) In finding or assuming that the complainant Mills was an active and real litigant, and controlled or directed the proceedings in this suit, and that he instituted the said action and prosecuted the same in good faith for the benefit of all the creditors of the defendant railway company, because the same is not true, and is disproven by the testimony. (2) In finding that the president, Samuel Thomas, and the vice president, John Greenough, and other directors of the company, did not procure and direct the institution of the suit, and did not actively, individually, and as officers of the company and representatives of the stockholders, aid and assist in its prosecution, and procure and assent to the decree of foreclosure and the confirmation of sale, for the purpose of reorganizing the company on a basis which would pay to themselves and friends their unsecured debts, and preserve and continue the interests of the stockholders in the property, and leave the debt due to the petitioner and other holders of like bonds unpaid, because such finding is not true, and is contrary to the evidence. (3) In finding that the said officers and directors did not participate in forming or constituting or procuring the reorganization committee, and in finding that such committee represented and acted only in the interests of the bondholders, and not in the interest of certain creditors and the stockholders, because the same is not true, and is contrary to the evidence. (4) In finding that the right of the stockholders, continued and preserved to them under the plan of reorganization, was of no value, because the same is not true, and is contrary to the evidence. (5) In finding that

the foreclosure proceedings in this case were not made in pursuance of an agreement between bondholder and stockholder to preserve the rights of both and destroy the interests of unsecured creditors.  (6) In reciting evidence incorrectly, in reporting immaterial and irrelevant matters, and in ignoring and not considering material and uncontroverted testimony.  (7) The special master also erred in not finding and reporting that this suit and the foreclosure proceedings were instituted by the railroad company, its officers and directors; that it was carried on, and the decree obtained and executed. at the request and with the aid and assistance of such company and its officers and directors; that this was done and the reorganization effected for the purpose of paying certain unsecured debts and continuing the interests of the stockholders in the property, and to leave the debt due to the petitioner and other like debts unpaid, and without power or opportunity to enforce payment; and that all of this was done under an arrangement between bondholders and stockholders by which their rights and the rights of the officers and their friends, who were unsecured creditors, could be preserved and maintained, and the rights of the petitioner be destroyed.  (8) In not finding that the allegations of the petition and amended petition of the Louisville Trust Company had been proven, and that the sale of the property heretofore made should not be confirmed until the rights of the petitioner and other creditors were preserved.  (9) In not finding and reporting that a receiver should be appointed to take charge of the property, under proper orders of court, and to maintain and operate the same for the benefit of the petitioner and other unpaid creditors, subject to such liabilities as might be adjudged to be prior in law, and that an accounting should be made by the Chicago, Indianapolis & Louisville Railway Company of the earnings and income of the property since the same has been in its possession."

The statement of the case in the opinion of the supreme court, it is to be observed, is in some respects different from the statement made by the circuit court of appeals, from which the cause was removed on certiorari to the supreme court.  See Louisville Trust Co. v. Louisville, N. A. & C. Ry. Co., 174 U. S. 674, 19 Sup. Ct. 827, 43 L. Ed. 1130; Id., 56 U. S. App. 208, 28 C. C. A. 202, 84 Fed. 539.  A restatement, in outline, of the principal facts, is deemed proper here, with an indication of such corrections and additions as are thought worthy of notation.

The decree of the circuit court of appeals for the Sixth circuit, affirming the validity of the guaranty by the New Albany Company of the Beattyville bonds, was rendered on June 22, 1896 (43 U. S. App. 550, 22 C. C. A. 378, 75 Fed. 433); and, instead of "within a few days" thereafter, it was not until August 24th ensuing, and after a number of attachment suits had been brought in Louisville by holders of the guarantied bonds, causing and threatening serious embarrassments to the New Albany Company, that Mills proceeded to obtain the appointment of a receiver.  It was not until November 16, 1896, that the decree in the Sixth circuit was removed on certiorari to the supreme court, and only after that date were the proceedings in this court in this case had while that case "was still undecided." Besides the portions of the Mills bill referred to in the opinion of the supreme court, it was alleged in that bill that the total amount of claims asserted against the company by reason of the bond guaranty, according to advice received of the officers of the company, would probably exceed $1,200,000; that the holders were numerous and scattered; that already suits in attachment had been brought against the company in the courts of Kentucky by some of the holders of the guarantied bonds, and the earnings and traffic balances

of the road seized in garnishment; that other like suits in Kentucky and Illinois, and seizures, not only of current earnings, but also of engines, cars, and trains of the road, when found in those states, were threatened, and, it was believed, would presently occur; that the company had no property other than its railroad, equipment, and appurtenances, and certain described corporate stock, all covered by mortgages, and was without resources to pay its unsecured debt, except from such surplus income from its road operations as might remain after paying interest upon mortgage bonds; that the current earnings, in consequence of a short wheat crop and lessened traffic, were about $60,000 a month less than for the corresponding period of the previous year; that the decline was likely to continue for some months, and it would be impracticable to realize therefrom, after paying operating expenses, taxes, and rentals, enough to pay the next shortly maturing coupons on $3,800,000 general and equipment mortgage bonds; that the decision holding the company liable for more than a million dollars upon its guaranty had absolutely destroyed the credit of the corporation so that it could not either pay or renew its bank obligations or fund the same, "and the said corporation is in fact insolvent"; and last before the prayer it was averred:

"That to permit its [the road's] severance, or the continuous disturbance of its operations, will result in ruinous sacrifice to every creditor of said corporation, and disable it from performing its duties as a public carrier. That the complainant verily believes that unless this court, in view of the present condition of the affairs of said insolvent corporation, and the divers threatened litigations, attachments, and seizures, and the impending and inevitable default soon to occur on the two mortgage liens aforesaid, will deal with the property as a single trust fund, and take it into its judicial custody for the protection of every interest therein, that divers individual creditors of the defendant will proceed to assert their remedies in the different courts in the several states where the property is situated; that levies and attachments will be laid upon the engines and cars of the company, and the fuel, material, and supplies which are indispensable to the continuous operation of the railroad will be seized, which will greatly interfere with and ultimately prevent the company from a proper discharge of its duties as a carrier, and seriously diminish the earnings of the road; that considerable and unnecessary multiplicity of suits will result; that judgments and priorities will be attempted, and the trust property, valuable mainly in consequence of its unity, will be dismembered by the conflicting decrees and judgments of the many courts exercising such separate jurisdictions at the suit of individual creditors."

On November 12, 1896, the Farmers' Loan & Trust Company and John H. Barker, trustees, filed their bill against the railway company to foreclose the consolidated mortgage, given to secure six per cent. bonds for $4,700,000, alleging a default in the payment of interest due on October 1, 1896. On the same day the Central Trust Company of New York and John H. Stotsenburg, trustees, filed their bill against the railway company to foreclose the general mortgage given to secure five per cent. bonds for $2,800,000, alleging a default in the payment of interest on November 1, 1896, and on that day the two suits for foreclosure and the suit of Mills were consolidated. On December 14, 1896, the Central Trust Company of New York and James Murdock, trustees, filed their bill against the railway company to foreclose the equipment mortgage, a first lien on equipment and a subordinate lien upon the railroad, given to secure

bonds for $709,000, alleging a default in the payment of interest due on December 1, 1896; and on December 21st a second order of consolidation was made, which included this suit and all the suits combined by the previous order, and not alone, as stated in the supreme court case, "these several foreclosure suits." The fact is important, since the right of the Louisville Trust Company to become a party and to prosecute the appeal was then, it appears, supposed to rest upon the fact of the Mills bill having been "filed in the avowed interest of himself and all other creditors." It was so contended in the circuit court of appeals in response to a motion to dismiss the appeal on the ground that the appellant was not a party to the decree appealed from. In their first brief, counsel for the appellant, citing Hollins v. Iron Co., 150 U. S. 371, 14 Sup. Ct. 127, 37 L. Ed. 1113, said:

"The present suit is a general creditors', brought by Mills on his own behalf, and all other creditors who may seek to come into it. That in such a case appellant had a right to intervene, there can be no doubt."

And in the supplemental brief, filed on November 30, 1897, besides other passages and citations of authorities to the same end, occurs this expression:

"The admitted insolvency of the Monon estops appellees from claiming any need of an execution and return of nulla bona, as, indeed, does the fact of Mills having obtained such a return."

Estoppels are mutual, it is to be remembered; and yet, after asserting a standing in court under Mills, the petitioner now denies that Mills had any standing.

On January 23, 1897, the Louisville Trust Company, upon a petition showing that it was a holder of guarantied bonds to the amount of $125,000, was allowed to appear in its own behalf. It made no averment or pretense of want of prior notice of the proceedings, offered no excuse for not coming in sooner, asked no time or leave to answer or to present a full petition, and alleged no reason why a decree should not then go; and, the parties to the foreclosure suits having all appeared and filed, so far as necessary, answers admitting the allegations of the bills, a decree was entered foreclosing the three mortgages in suit, and directing a sale of the property. The decree contains the usual reservation of unconsidered questions for future determination, and the special reservation, added to meet an objection or suggestion of counsel for the Louisville Trust Company, of "full power to adjudge with respect to the income of the receivership and the rights of creditors in and to the same." The mortgages, it should be noted, all covered income. The Louisville Trust Company took no further step until February 27th, when the advertised day of sale was but ten days off. It then filed, and on March 9th brought to the attention of the court, the so-called "full intervening petition, verified by affidavit,"—that is to say, by the affidavit of the president of the Louisville Trust Company, who, claiming no knowledge on the subject, and giving no source of information or reason for his belief, simply "saith that the statements contained in the foregoing petition are true, as he verily believes." That petition is a long one, and contains much more than is set out or indicated

in the statement of the case in the supreme court. It filled more than ten pages of the printed record in the circuit court of appeals. After formal averments and a recital of the facts concerning the execution and guaranty of the Beattyville bonds and the litigation which resulted in the decree of the circuit court of appeals for the Sixth circuit, on the fourth page is a statement of the proceedings by Mills, which, it is alleged, "were procured by the said New Albany Company for the purpose of hindering and delaying the unsecured creditors of said company in the enforcement of their debts." This is followed by a statement of the proceedings and decree in the foreclosure suits, and on the next page comes the averment, not observed or not apprehended by this court, and not referred to in the opinion of the circuit court of appeals, which the supreme court has treated as sufficient alone to entitle the petitioner to relief. "The allegations of this intervening petition as to the wrong intended and being consummated," said that court, "were specific and verified," and on the strength thereof, unaided by evidence, declared:

"It is not true that in revising and reversing the final action of the circuit court we are acting on mere suspicion, or disturbing either settled rules or admitted rights."

The allegations referred to are these:

"And the petitioner further says that prior to the entry of the said decree the holders of the bonds secured by the mortgages to the Farmers' Loan & Trust Company and the Central Trust Company as aforesaid, and the holders of the preferred and common stock of the said Louisville, New Albany & Chicago Railway Company, or a part thereof, had entered into an arrangement or agreement for the purpose of procuring the sale of the said property, its purchase by and in behalf of the parties entering into such combination, and reorganization thereof, and the issue of securities to the said parties, including said stockholders, without the payment of the debts and liabilities of the said company, and for the purpose of hindering and delaying the said creditors, and with a view to prevent the collection or enforcement of such debts and liabilities, and that the said decree of sale was obtained by the said company and said complainants in order to carry out such unlawful purpose, and to prevent the general or unsecured creditors of the said company from having an opportunity to be heard in matters arising in the said cause."

The petition then proceeds with averments which were the subject of discussion in the circuit court, and which alone, as the opinion delivered shows, were considered by the circuit court of appeals. Those questions were of the validity of certain consolidations, by reason of the invalidity of which it was claimed that property and franchises in Illinois were not covered by any of the mortgages; that no title was acquired by the Chicago & Indianapolis Air-Line road, and, therefore, in respect to that part of the road, the mortgage for $2,800,000 to the Farmers' Loan & Trust Company and John H. Barker, trustees, was illegal, and likewise the other mortgages thereafter executed. It was further alleged that, by reason of provisions in the several mortgages quoted in the petition, the suits for foreclosure were prematurely brought. It was also alleged that the New Albany Company had large assets not included in any of the alleged mortgages, which were subject to the demands of unsecured creditors, but were unknown to the petitioner; that the moneys earned by the receiver over and above the amount neces-

sary for operating expenses should be, and does constitute, a fund for distribution among the creditors; that the net earnings amounted to a large sum, but the amount thereof was unknown to the petitioner. It was further alleged, on information and belief, that a large portion of the capital stock of the New Albany Company had not been paid by the subscribers or holders thereof; that a very large sum was due and payable by the holders of stock to the company, which should be directed herein to be collected and distributed to the creditors. The prayer of the petition is as follows:

"Wherefore your petitioner prays that the decree of foreclosure and sale heretofore entered in this cause be set aside; that the pretended consolidations herein mentioned be adjudged void, and that the said mortgages before mentioned be declared to be invalid; that this cause be referred to a commissioner to ascertain and report what assets of the said New Albany Company are embraced by any liens, and what are not so included, and the amounts and descriptions thereof, and that, among other things, the master be directed to ascertain what portion of the capital stock has not been paid for, and the amounts due thereon, and that the receiver herein be directed to take steps to enforce the collection of any amounts due to the said company; that due and proper advertisement be given for the proof of debts, and that said master be directed to ascertain and report the names of the creditors herein, and the amounts of debts due to them; that it be adjudged that the master ascertain what net earnings have accrued and shall hereafter accrue from the operation of the said railway in the hands of the receiver, and that the amount thereof be adjudged and declared to be a fund to be distributed among the general and unsecured creditors of the said company; and that all such other and further proceedings be had for the sale of the assets of the said company, and the distribution thereof, as shall be according to law and the rights of the parties."

All this, it will be observed, is on the theory of a valid and honest receivership, under which, conducted regularly, the rights of the petitioner and others interested should be enforced. If the allegations that the proceedings of Mills were intended to hinder and delay creditors, and that the decree was obtained in order to carry out the alleged agreement between bondholders and stockholders, had been deemed substantive, the proper prayer would have been that the suits be dismissed. That those averments were not considered by counsel for the petitioner to constitute ground for relief in the circuit court of appeals is shown by their briefs. Rule 24 of that court required that the brief for appellant should contain (1) "a concise abstract or statement of the case"; (2) "a specification of the errors relied upon"; and (3) "a brief of the argument, exhibiting a clear statement of the points of law or fact to be discussed." The statement of the case in the brief for the appellant concluded with this statement:

"On the 27th day of February, 1897, the Louisville Trust Company filed a second intervening petition, in which it set out in detail its claim as creditor, and alleged that the orders entered in the case and the decree had been obtained by collusion between Mills and the other complainants and the railroad company for the purpose of obtaining the property of the Monon without the payment of the general creditors, and prayed that the decree be opened and the sale postponed, the case referred to a commissioner to ascertain debts, liens, etc., the net earnings of the road in the hands of the receiver, and that further proceedings be had for the sale of the assets of the company and a distribution thereof. On the 9th of March the court refused to open the decree or postpone the sale, and on the 10th day of March the road was sold, and the

same day the report of sale was filed, and on the same day the report was confirmed. On May 1, 1897, an appeal was prayed by the Louisville Trust Company to this court, and was granted. The above statement is an outline of perhaps the boldest attempt to obtain possession of railroad property at the expense of its creditors ever shown by the records of a court of equity."

The argument made was directed wholly to two specifications of error, namely, that the cause was not ready for hearing and the decree premature, and that the court erred in deciding that the trustees in the mortgages were entitled to a foreclosure at the time the suits were brought and at the time the decree was entered. Under the first of these specifications it was insisted that "the case of Mills was clearly not ready," for the reason stated at the conclusion of the argument in this wise:

"Without having had a chance to ascertain the assets of the Monon, its earning capacity, or its indebtedness, we cannot say with any degree of accuracy, and this court cannot know, whether or not a sale was or is needed at all. [We do know, however, that this suit was only instituted to free the Monon from the debt that the circuit court of appeals for the Sixth circuit has said it incurred by its guaranty of the Beattyville bonds.] We do know that during times much worse than those existing at the time of and since the filing of this suit the Monon was always able, out of its earnings, to pay the interest on its bonded indebtedness."

Other than the sentence in brackets, there is no reference in the original brief to the allegations in question, and in the supplemental brief filed after the oral argument there is nothing on the subject. As the case was presented to it, the circuit court of appeals was therefore justified in saying, as it did, that "the sole ground of objection to the complainants' case in the court below, as set forth in the petition of the appellant asking to have the decree set aside, and which was addressed to the discretion of the court, was the total invalidity of the various bonds and mortgages because the defendant corporation, which is a consolidated company, was never regularly consolidated," etc.; and it was with reference to the case as then presented, and not as it was afterwards treated by the supreme court, that the circuit court of appeals used the expression, "a travesty upon equity proceedings." The supreme court had said as much in Bronson v. Railroad Co., 2 Black, 524, 528, 17 L. Ed. 347. It is not to be supposed that a scheme of foreclosure and reorganization shown to be designed to preserve the interests of stockholders at the expense of creditors could receive the sanction of an honest and intelligent court or judge, and, if such a question is to be regarded as novel, it must be because of the manner of presentation and treatment. Whatever may have been said in the course of the argument before him, the judge of the circuit court did not apprehend, and, until the ruling of the supreme court was announced, did not know, that the case involved the question decided. Indeed, if counsel had made the point, and had designated the averments intended to present it, it is not probable that, without the aid of the opinion of the supreme court, the averments would have been deemed sufficiently comprehensive and specific, or duly verified. The allegation that the proceedings in behalf of Mills "were procured by the said New Albany Company for the purpose of hindering and delaying the general or unsecured creditors of said company in the enforcement of

their debts" probably would have been construed to mean, not a fraudulent purpose, but a purpose to cause only the hindrance and delay necessarily incident to the proceedings; and, even if the averment should have been deemed to be of a fraudulent purpose on the part of the railroad company, it would have been thought to affect in no way the proceedings of Mills or the foreclosure suits, it not being alleged that Mills and the trustees in the mortgages knew of or participated in the fraudulent intent. It is certainly a novel idea that a debtor, who, with intent to hinder and delay his general creditors, procures one of them, who is ignorant of his purpose, to bring proceedings for the appointment of a receiver, thereby lays the foundation not only for the defeat of the creditor who brings suit, but for the defeat of suits thereafter brought for the foreclosure of mortgages by trustees likewise innocent of any fraudulent design or knowledge. So, too, the allegation in respect to the obtaining of the decree probably would have been deemed indefinite, inadequate, and not sufficiently verified to be acted upon without proof. The Farmers' Loan & Trust Company and the Central Trust Company are alleged to have been parties to the agreement with the holders of the stock, or part of it; but their respective co-trustees, Barker, Stotsenburg, and Murdock, are not implicated. What the agreement or arrangement was is not stated; nor that it continued in force, or had anything to do with bringing about the decree. The allegation is that "prior to the entry of the said decree" the parties named "had entered into an arrangement or agreement for the purpose of procuring the sale of said property, its purchase by and in behalf of the parties entering into such combination, and reorganization thereof, and the issue of securities to the said parties, including said stockholders, without the payment of the debts and liabilities of said company, and for the purpose of hindering and delaying the said creditors, and with a view to prevent the collection or enforcement of such debts and liabilities." Besides not including the individual trustees, who, for all that is alleged, may have had control of the suits, and besides the evident improbability of an agreement which contemplated "the issue of securities to the said parties," that is to say, to the trust companies (but not as trustees), the agreement, if in force and operative to bring about the decree, was not unlawful because it contemplated a sale and reorganization without the payment of unsecured debts or liabilities, unless there was a purpose to take from those creditors something which belonged to them, outside of or over and above the mortgages, and nothing of that kind is alleged; nor, because of the alleged purpose of hindering and delaying, it not being alleged that a hindering or delaying beyond what was necessarily incident to the proceedings of foreclosure prosecuted by lawful and regular methods was contemplated. The concluding part of the allegation, that the decree of sale "was obtained by the said company (not stockholders, as first stated) and said complainants in order to carry out such unlawful purpose, and to prevent the general or unsecured creditors of the said company from having an opportunity to be heard in matters arising in said cause," does not help, but, rather, detracts from, what preceded. "Such unlawful purpose" is meaningless, because nothing un-

lawful as against the petitioner had been alleged, and, instead of a purpose to hinder and delay, even to an extent unavoidable, the intended wrong dwindles to a purpose "to prevent the general or unsecured creditors of the said company from being heard in matters arising in the said cause." This certainly does not mean, and from the entire allegation, whether taken together or analyzed clause by clause, I should have been unable, without authoritative instruction, to deduce, "an agreement between mortgagee and mortgagor [bondholder and stockholder] to preserve the relative rights of both, and simply extinguish unsecured indebtedness." The supreme court gave much weight to "facts apparent on the face of the record," which, taken as a whole, were declared to be "very suggestive, independent of positive allegation,—so suggestive, at least, that when a distinct and verified charge of wrong was made the court should have investigated it." As already explained, the charge of wrong under consideration, if mentioned or hinted at by counsel, escaped the attention of this court. The facts referred to, however, were well known to the court; and for some of them the court was directly, and for others indirectly, responsible. The court appointed the general manager of the road the receiver. The court entered the judgment at law in favor of Mills, and on the same day entertained and granted the application for the appointment of the receiver. The court knew of the proceedings and decrees in the Sixth circuit, and that it was because of the large liability thereby established, and of the attachment suits begun and threatened, that the application for a receiver was precipitated. It was the belief of the court, too, that the Mills suit was a friendly one, brought because at that time there had been no default in the payment of interest upon mortgage bonds which could be made ground for a suit to foreclose. I suppose it to be "common knowledge" that, when an emergency for a receivership arises, it is not infrequently applied for and granted upon the bill of a friendly creditor in anticipation of an early default in the payment of interest, which will afford ground for a mortgage foreclosure. The creditors' bill in this case was ample in its showing of the insolvency of the company, and the attachment suits which had been brought and those threatened constituted an unusual and imperative emergency for immediate action. Any delay for the sake of seemliness of procedure would have been itself at once an unseemly pretense and a denial of just relief in a pressing emergency, brought about by those who now complain. The court did not know that Mills held his demand against the company as trustee for a syndicate of which the president of the company was a member, nor that the demand was secured by a pledge of collaterals; but the security being, as the proof shows, largely inadequate, it is not perceived that the proceedings were censurable or any the less valid on account of those facts. On all these phases of the case it is enough to quote from the recent opinion of the supreme court itself, in the case of Dickerman v. Trust Co., 176 U. S. 181, 189, 20 Sup. Ct. 312, 314, Adv. S. U. S. 312, 314, 44 L. Ed. ——:

"We have no doubt that this judgment was collusive, in the sense that it was obtained by the plaintiff and consented to by the defendant company

for the purpose of giving the trustee a legal excuse for declaring the principal and interest of the mortgage to be due, and to give authority for a foreclosure. But this did not constitute collusion in the sense of the law, nor does it meet the exigencies of the petitioner's case. 'Collusion' is defined by Bouvier as 'an agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law,' and in similar terms by other legal dictionarians. It implies the exercise of fraud of some kind,—the employment of fraudulent means or lawful means for the accomplishment of an unlawful purpose; but if the action be founded upon a just judgment, and be conducted according to the forms of law and with a due regard to the rights of parties, it is no defense that the plaintiff may have had some ulterior object in view, beyond the recovery of a judgment. so long as such object was not an unlawful one. In Morris v. Tuthill, 72 N. Y. 575, which was also a suit to foreclose a mortgage, the court observed: "The facts that the assignor of a mortgage and his assignee acted in concert with a view unnecessarily to harass and oppress the mortgagor, and with intent to prevent payment, to the end that the equity of redemption might be foreclosed, and they become purchasers for less than the value, do not constitute a defense to an action to foreclose a mortgage. So, also, the facts that the assignee took title from motives of malice, and solely with the view to bring an action, and that the assignor assigned from a like motive, and without due consideration, furnish no defense, and do not impeach the plaintiff's title. It is sufficient to sustain the action that the mortgage debt is due, has been transferred to and is owned by plaintiff; and the mortgagor can only arrest the action by paying or tendering the amount due.' If the law concerned itself with the motives of parties, new complications would be introduced into suits, which might seriously obscure their real merits. If the debt secured by a mortgage be justly due, it is no defense to a foreclosure that the mortgagee was animated by hostility or other bad motive. Davis v. Flagg, 35 N. J. Eq. 491; Dering v. Earl of Winchelsea, 1 Cox, Ch. 318; McMullen v. Ritchie (C. C.) 64 Fed. 253, 261; Toler v. Railway Co. (C. C.) 67 Fed. 168. Now, in this case there is no doubt that Flanagan's claim was an honest one; that the coupons upon which he brought the suit were due and unpaid: and there is nothing to show that he would not have been entitled to a judgment upon them if the defendant had made a contest. The company was notoriously insolvent. Its coupons for 1894 and 1895 were unpaid. All its property was subject to the mortgage given to secure its bonds. It could no longer continue its business. Flanagan had a perfect right to bring suit, and under these circumstances the president of the company was guilty of no wrong in consenting to a judgment, and to the immediate issue of an execution. The company was not bound to defend if there were no defense. The forms of law were complied with. It would doubtless have been more seemly if judgment had not been entered until the return day of the summons. if the execution had not issued until the expiration of the twenty days allowed by law, and if the trustees had not been so alert in seizing upon the nonpayment of the judgment as an excuse for declaring the principal and interest of the bonds to be due. But this haste did not render the judgment or execution void. If the company had become insolvent and could no longer carry on its business, it was not only its legal obligation, but its moral duty, to surrender the mortgaged property to the mortgagees, in order that the latter might protect their interests. If the corporation saw fit to consent to a foreclosure, a minority of stockholders cannot question their right to do so. The fact that the Flanagan action was undertaken for the purpose of enabling the trustee to declare the principal and interest due does not invalidate the proceedings, so long as there was a debt due, an action properly conducted to recover it, and the object to be gained was not an illegal one."

The exceptions to the master's report embrace many matters which are irrelevant, or, if found one way or another, constitute, at most, only evidence upon the ultimate issue to be determined. The fourth, fifth, and eighth exceptions are directed to the inquiry ordered by the supreme court, and will be considered together as presenting

the question whether "it is true, as alleged, that the foreclosure proceedings were made in pursuance of an agreement between the bondholder and stockholder to preserve the rights of both and destroy the interests of unsecured creditors." The scope of this inquiry, and the principles upon which it should be determined, must be found in the opinion of the supreme court, unless in any particular the matter was put at large by the amended and supplemental petition, to the filing of which, without prejudice to the rights of the respondents to object on account of the delay and laches of the petitioner, there was no objection. In so far as they relate directly to the subject of inquiry, the allegations of the amended petition are as follows:

"And the petitioner charges that the proceedings in behalf of the said John T. Mills, Jr., were solicited and procured by the said New Albany Company, or the board of directors thereof, including Samuel B. Thomas, president, and W. H. McDoel, vice president, for the purpose of hindering and delaying the general or unsecured creditors of the said company, and to prevent the enforcement of their debts, and were not instituted or prosecuted by the said John T. Mills, Jr., in good faith, or for the purpose of protecting himself or the creditors of the said company. * * * And the petitioner further says that prior to the filing of such bills, and prior to the entry of the said decree, there had been constituted a committee, and which had been formed by and in behalf and with the apparent approval and at the instance of the officers and directors of the said company, and which consisted of Frederick P. Olcott, Henry W. Poor, and Henry C. Rouse, and styled, 'The Committee of Bondholders,' for the purpose of bringing about a sale and reorganization of the railway properties of the New Albany Company; and an arrangement or agreement had been made and entered into by such committee, and by holders of bonds and the officers and directors of said company, for the purpose of procuring a sale of the properties of the said New Albany Company, and its purchase by and in behalf of the bondholders and of the stockholders of the said corporation, and for the purpose of continuing and preserving the interest of the stockholders in the said corporation without the payment of the debts and liabilities of the said company, and for the purpose of hindering and delaying and defrauding the unsecured creditors of such corporation, and with a view to prevent the collection or enforcement of any such claims against the said company, and that, for the purpose of carrying out and effecting such unlawful scheme, a device was adopted by which the said committee attempted or pretended to make sale of certain securities of the reorganizd company to a syndicate, which was, as the petitioner is informed and believes, largely composed of officers, directors, and stockholders of the said company, including the said president and vice president, but with an agreement that upon payment of a small assessment the stockholders in the old company should be able to convert their stock into the stock of the new company, and thus preserve and continue their interests, and that no provision was made by which any general creditor was entitled to be paid, or to obtain or to receive any of the securities or other rights in the reorganized company, and that because of the said agreement the complainant John T. Mills, Jr., at the instance and request of the officers of the company, and the company itself, by its said officers, acquiesced in the entry of a decree of sale herein; and the foreclosure suits were brought and said decree was entered after said arrangement had been made, and for the purpose of carrying out the same, and of securing the interest of the stockholders, and depriving the general creditors of any power to enforce their claims against the corporation, and that afterwards, in pursuance of the said agreement, the said John T. Mills, Jr., and the said corporation agreed to the confirmation of the sale herein on the same day upon which it was made,—all of which was because of the said fraudulent agreement by which they were to preserve and continue their rights and interest in the property without the payment of the debts and liabilities of the company. * * * And the petitioner further says that the said Chicago,

Indianapolis & Louisville Railway Company was so organized for the purpose of carrying out the scheme before mentioned, and in pursuance thereof did issue their securities accordingly, and that the said preferred and common stockholders of the Louisville, New Albany & Chicago Railway Company were allowed to and did convert their old stock into the stock of the new company, according to the said plan or arrangement, and such old stockholders, or their assignees, are now the owners and holders of such stock. * * * Wherefore the petitioner prays that the court do appoint a receiver, with directions to take charge and custody of the railways and other properties and assets of the Louisville, New Albany & Chicago Railway Company, and which are now in possession of the Chicago, Indianapolis & Louisville Railway Company, and that he be directed to manage and operate such railways, and to collect and hold any and all other assets for the benefit of those who may be entitled by law, and that he be authorized to collect from the Chicago, Indianapolis & Louisville Railway Company all and every asset, property, and the amount of any claim in the hands or in possession of such company and belonging to the Louisville, New Albany & Chicago Railway Company, and that he require and enforce an accounting by the said company of all the earnings derived by such company from the operation of the said railways since it took possession thereof, and for all and such other and further relief as to the court shall seem meet. And the petitioner further prays that an order be entered herein directing the defendants, the Louisville, New Albany & Chicago Railway Company, the Farmers' Loan & Trust Company and John H. Barker (trustees), the Central Trust Company and John H. Stotsenburg (trustees), the Central Trust Company and James Murdock (trustees), John T. Mills, Jr., Frederick P. Olcott, Henry W. Poor, Henry C. Rouse, and the Chicago, Indianapolis & Louisville Railway Company, to appear, within a time to be fixed in such order, and to plead and make answer to the allegations herein,—an answer under oath, however, being expressly waived,—and for all such other and further orders and judgments as to the court shall seem meet and proper."

In so far as these averments differ from the original petition, as it was construed by the supreme court, they seem to me to impair, rather than to strengthen, the petitioner's position in the case. If it be assumed, as, perhaps, in view of the construction put upon the original petition, it must be, that there is an adequate charge of an arrangement or agreement entered into for a fraudulent purpose, it was not "between the bondholder and stockholder," as expressed in the mandate, but was "made and entered into by such committee and by holders of bonds and the officers and directors of said company." It is alleged, on belief, that the syndicate was largely composed of officers, directors, and stockholders; but that can hardly be deemed to help out the previous averments, since the same individuals may have been (the evidence shows they were) both bondholders and stockholders, and an allegation of an agreement entered into by them does not show an agreement between the bondholder, on the one side, and stockholder, on the other, in the sense of the mandate. Furthermore, while it is averred that the preferred and common stockholders of the old company "were allowed to and did convert their old stock into stock of the new company," it is not alleged that the privilege of so doing was of value, or that the stock so acquired in the new company was worth more than the cash sums which by the plan were required to be and were paid therefor. But a more radical and, as it seems to me, a fatal, defect in the petition is the failure to allege that the trustees in the several mortgages participated in or knew of the wrongful purpose attributed to the bondholders' committee and the officers and

directors of the New Albany Company; and, if the averment had been made, it would have been without support in the evidence. There being no question but that the mortgages foreclosed were valid and an installment of interest upon the bonds secured thereby overdue and unpaid when the suits were brought, no agreement, conduct, or purpose, however fraudulent or wrongful, of Mills and the officers of the railway company, in respect to the proceedings of Mills, or of the bondholders' committee and the officers of the company, or of any syndicate, could be ground for an attack upon the decree of foreclosure, unless the trustees knew of the intended wrong, and prosecuted the suits to a decree and sale for the purpose of aiding in its consummation. And even in such case, unless it were shown that the holders of the bonds secured by the mortgages were also implicated in the scheme, on what ground or theory could equity interfere? The allegation "that because of the said agreement the complainant John T. Mills, Jr., at the instance and request of the officers of the company, and the company itself, by its said officers, acquiesced in the entry of the decree, * * * and [Mills] agreed to the confirmation of the sale herein on the same day upon which it was made," is obnoxious to criticism. In the first place, it is not true. In the entry of the decree there is no recital of the presence or consent of Mills. His rights under his bill were not adjudged by the decree. In the order of confirmation his presence and consent by counsel are stated, but there is no evidence that this consent was in any manner due to, or given "in pursuance of, the said agreement"; and the assertion "that because of the said agreement * * * the company itself, by its said officers, acquiesced in the entry of the decree," in view of the alleged responsibility of those officers for all that was done from the beginning, is little less than preposterous. If the company seemed "a most willing debtor to have all its property destroyed," the evidence shows that it was also a most helpless one, which after a struggle for existence maintained for a decade or more, not by its earnings, but by the proceeds of sales, at ruinous sacrifice, of bonds and stock to the amount of millions, had finally been reduced to dependence upon the personal credit of its president and others, against whom these accusations have been lodged because they were unwilling to go on in a hopeless attempt to carry the company under the new and unexpected burden imposed upon it by the decree in the Sixth circuit. The only theory suggested in the opinion of the supreme court by which the petitioner's standing in the case can be vindicated is that there was an agreement to preserve the rights of stockholders at the expense of creditors, and that in consideration therefor the stockholders were induced to submit without objection to a speedy foreclosure. "It is one thing," says the opinion, "for a bondholder who has acquired absolute title by foreclosure to mortgaged property to thereafter give of his interest to others, and an entirely different thing whether such bondholder, to destroy the interest of all unsecured creditors, to secure a waiver of all objections on the part of the stockholder and consummate speedily the foreclosure, may proffer to him an interest in the property after the foreclosure.

The former may be beyond the power of the courts to inquire into or condemn. The latter is something which on the face of it deserves the condemnation of every court, and should never be aided by any decree or order thereof. It involves an offer, a temptation, to the mortgagor, the purchase price thereof to be paid, not by the mortgagee, but in fact by the unsecured creditor." That theory the amended petition abandons or ignores, and, instead, vainly alleges the obtaining of the consent of Mills and of the company itself, through its officers, to the decree of foreclosure and to the confirmation of sale. For reasons already adverted to, the consent of neither, as alleged, is of the slightest consequence.

Of the evidence taken by the master, all of which I have carefully read, except some of the tabulated statements, little more need be said. To establish the supposed agreement between the bondholder and stockholder reliance is placed upon certain documentary evidence, supplemented, it is claimed, by published statements attributed to Samuel Thomas, as president of the New Albany Company. An article in the Commercial and Financial Chronicle of August 15, 1896, after reference to attachment suits by Beattyville bondholders, professed to give an "official statement" made the day before by President Samuel Thomas, but not signed, in which were the following expressions:

"The lawyers of the New Albany Company deem the defense of the company to be impregnable, but the litigants are trying to make the procedure as vexatious as possible. Even should they attain finally to a judgment in their favor, the claim would rank only as an unsecured debt, subsequent to all the existing mortgages, and it would be extinguished by an assertion of the rights of the mortgagees. Should it ever become necessary for the mortgagees to take action to extinguish the claim, there seems to be no doubt that the road would be ultimately restored to the stockholders, and that there is no danger of their stock being wiped out. The legal situation is totally unexpected, and must be admitted to be menacing to the present credit and convenience of the company, but the situation does not justify such a sacrifice of their property as the proprietors have been frightened into making. The equity in the road is valuable, and the best efforts of the management will be directed to maintain it in the present stockholders."

In the same journal, of August 29, 1896, was published an interview, attributed to President Thomas, containing the following:

"The receivership, however, was precipitated by the attempt of the Beattyville bondholders to enforce the payment of interest on their bonds, under Judge Taft's recent decision upholding the guaranty. An official statement regarding this attempt was in the Chronicle of August 15, 1896 (page 269). A majority of the New Albany bonds is held by the friends of the company, and the intention is to reorganize after foreclosure sale. This will result in debarring all claims on account of the Beattyville guaranty. * * * This action is taken in the interest of the present security holders, and will maintain the property intact until such time as a reorganization can be arranged. The company has always been abundantly able to pay all of its debts, and its solvency has never been questioned until the judicial decision of Judge Taft opened the way to saddle the company with the debts of another road. It is to-day in better physical condition than ever before, and its capacity for earning money is better. The sole embarrassment arises from the fact that it has been called upon to pay the debts of another corporation. The receivership will put an end to this, and all similar causes of annoyance inherited from past management. A majority of our mortgage bonds is in the hands of friends of the company, and it will be easy to arrange for a foreclosure

which will extinguish the alleged claims in connection with the Beattyville suit, and will enable the property to be restored to those at present interested in it without the sacrifice of any part of their existing values."

These interviews, counsel for the petitioner concede, were prepared by John Greenough, the vice president of the company, but, they insist, were submitted to and approved by Gen. Thomas. I have no doubt they expressed his thoughts and purposes at that time.

A bondholders' agreement, purporting to be made on October 10, 1896, after reciting the necessity of action to protect their interests, and that foreclosure suits had been or were about to be instituted, proceeds to constitute Frederick P. Olcott, Henry W. Poor, and Henry C. Rouse a committee, and to define their powers and duties. In the eighth article is this clause:

"And, generally, for the purpose of carrying out the plan and making the same effective, the committee is authorized and empowered to enter into a contract or agreement with a syndicate, containing such conditions and provisions as the committee may approve, to sell and deliver to said syndicate, for the sum of $2,100,000 in cash, the following securities of the new company, viz.:

Refunding mortgage five per cent. fifty-year gold bonds, of
   the par value of........................................ $ 1,500,000
New preferred stock, of the par value of.................... 680,750
New common stock, of the par value of..................... 10,500,000"

The committee so appointed put out a statement, dated October 10, 1896, and addressed, "To the Holders of the Bonds of the Louisville, New Albany and Chicago Railway Company," in which the proposed plan of reorganization was set out, the important features of which were these: The new company, to be called the Chicago, Indianapolis & Louisville Railway Company, was to issue refunding mortgage five per cent. fifty-year gold bonds to the amount of $15,-000,000, of which $11,409,000 should be used to take up existing bonds of the old company to the amount of $13,509,000 (only $700,-000 of the new bonds going to the holders of $2,800,000 general mortgage bonds), $1,500,000 should be sold for cash to a syndicate, and $2,091,000 should be deposited with a trustee, and issued from time to time, not exceeding $400,000 in any year, for betterments and equipments, and should also issue, of new preferred stock, four per cent., noncumulative, $5,000,000, and of new common stock, $10,-500,000. "To provide the capital needed by the new company, it is proposed to sell for the sum of $2,100,000, in cash, new bonds to the amount of $1,500,000, together with $680,750 preferred stock and $10,500,000 of the new common stock. A responsible syndicate has made a proposition to purchase the same, and has entered into an agreement with the committee to allow the holders of the old preferred and common stock, extinguished by the foreclosure, the first opportunity of subscribing for the new common stock, on the following basis: The existing (old) preferred stock shall have the privilege of subscribing for an equal amount of common stock in the new company at $7.50 per share, receiving, in addition thereto, new preferred stock equal to the amount of cash paid. The existing (old) common stock shall have the right to subscribe, at $7.50 per share, for an amount of common stock in the new company equal

to one-third of the existing (old) common stock, receiving with each subscription, in addition, new preferred stock equal to the amount of cash paid. The effect of these provisions will be as follows: Each $100 of existing (old) preferred stock will receive $100 of new common stock, and $7.50 of the new preferred, paying therefor $7.50 in cash. Each holder of $300 of existing (old) common stock will receive $100 of new common, and $7.50 of new preferred, upon payment of $7.50 in cash. The syndicate is not to be required to extend the privilege of subscription to the capital stock of the Chicago, Indianapolis and Louisville Railway Company (the new company to be organized to purchase the property) beyond the first day of January, 1897." The syndicate agreement also purports to have been made on October 10, 1896, between Olcott, Poor, and Rouse, "as a committee of bondholders" of the railway company, and Samuel Thomas, for himself and his associates, called the "Syndicate." By the fourth article "the syndicate promises, covenants, and agrees to and with the committee that it (the syndicate) will give and cause to be given to the owners and holders of the preferred stock and common stock of the existing Louisville, New Albany and Chicago Railway Company the right to subscribe for the new common stock aforesaid before any of the said new stock shall be distributed among the members of the syndicate, upon the following terms, that is to say"; the terms stated being the same as those announced in the published plan of the committee.

Another contract, bearing the same date (October 10, 1896), between Samuel Thomas, representing the syndicate, and the Central Trust Company of New York, simply made the latter company the agent of the syndicate to effect the proposed surrender of old stock and issue of new upon the terms prescribed; it being provided, among other things, that the trust company should cause notice by advertisement to all holders of preferred and common stock of the existing company that on or before November 30, 1896, such holders might surrender to and deposit with the trust company their certificates of stock, duly indorsed in blank, and receive therefor receipts of the trust company entitling the holder to new common stock, etc. Whether such notice was given does not appear.

These writings show no agreement between the bondholder and stockholder, as such. They do show an agreement between the bondholders' committee and the syndicate by which the latter covenanted with the committee that the holders of old stock should have the privilege of subscribing for the stock sold to the syndicate on the terms stated. That committee represented bondholders, but not all of them. Some members of the committee and also of the syndicate were holders both of bonds and of stock, but no member of either was a holder of stock alone. The holders of eighty-five per cent. of the stock of the New Albany Company availed themselves of the privilege of taking the new stock, and paid therefor $584,545 to the syndicate. To what extent they were also holders of bonds, does not appear. To a large extent they were also holders of bonds, and it does not appear that any one who was not a bondholder availed himself of the privilege. After August, 1896, the stock of the New

Albany Company was practically worthless, the quotation of the common on October 12, 1896, being $1\frac{1}{2}$ and of the preferred $3\frac{3}{4}$ to $4\frac{1}{4}$, and by December and January following the value had run down to a fraction of a cent for the common, and 1 to 2 cents for the preferred. The special master has reported that there was no damage to the unsecured creditors, and that the privilege given to the holders of stock in the old company to obtain stock in the new was of no value, and the weight of the evidence seems to justify the finding. At most, the value of the privilege was no more than nominal, and the finding that there was no fraud or fraudulent conspiracy on the part of the trustees, the bondholders, the stockholders, or the New Albany Company is, beyond question, right. There is no evidence tending to show that the privilege so given was offered in order "to secure a waiver of all objections on the part of the stockholder, and speedily consummate the foreclosure," or for any like purpose. It does not appear that any stockholder ever complained of the receivership, or hinted at opposition to the proceedings at any step. No objection was ever made to the plan of reorganization, except by the holders of consolidated six per cent. bonds, and to meet that objection the plan was modified so as to give them a new six per cent. bond. Finally, whatever was the value of the privilege in question, and whatever the purposes and motives of those concerned in giving it, it is not shown that the stockholders obtained anything at the expense of the creditors. On the contrary, it is clear that the entire property which was covered by the mortgages foreclosed, and passed by the sale to the purchaser, was worth much less than the mortgage debts; and if anything of value was given to the stockholder by the plan of reorganization, beyond what he paid for with new money, it was at the expense of the bondholder. The foreclosed mortgages secured bonds and interest due to an amount exceeding $8,600,000, and the sale was for only $3,001,000. Do these facts make out a case within the condemnation of the supreme court?

To be literally within the mandate, there must have been an agreement between "the bondholder and stockholder," but manifestly that is not to be read literally. It does not mean a single bondholder on one side, nor a single stockholder on the other. Does it mean all bondholders, or all stockholders? It may not fairly be said to mean all stockholders, because the creditor would have a right to complain of the destruction of his interests, whether in favor of one or all of the stockholders. But if, on the other hand, it does not mean all of the bondholders, then how can the relief proposed be given, without injuring the bondholder who had no share in the wrong? The "public interest," which, in a well-known line of cases, commencing with Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339, has been deemed to "justify a limited displacement of contract and recorded liens in behalf of temporary and unsecured creditors," has reference to the public convenience as involved in the continued and safe operation of railroads; and, outside of that, there would seem to be no "public considerations" which require, in the foreclosure of a railroad mortgage, any departure from "the ordinary rules or rights of mortgagor and mortgagee in a foreclosure." It was on

public considerations (that is, to make the road a safe and efficient carrier) that receiver's certificates to the amount of $200,000 were issued and made a charge upon the income of this road. It was not a matter of public concern that a default in the payment of interest should have been forestalled, and certificates to raise money for that purpose nobody stood ready to buy. It is for the public interest that in all litigation the rights of parties shall be determined upon settled and consistent principles. In Railroad Co. v. Howard, 7 Wall. 392, 19 L. Ed. 117, in pursuance of a plan for the sale, purchase, and reorganization of a railroad under a decree of foreclosure, one-sixth of the purchase price was to go (and the new company was ready to pay the amount) to the stockholders of the old company; but, on a bill brought by creditors, it was held that they were entitled to have their whole debt paid before any portion of the fund derived from the sale should go to the stockholders of the old company, which was insolvent. That was a direct and fair mode of enforcing "the familiar rule that the stockholder's interest in the property is subordinate to the rights of the creditors,—first of secured, and then of unsecured, creditors"; and what reason was there why the petitioner in this case, with equal simplicity and directness of procedure, should not have brought a bill to enjoin the delivery of the new stock to the holders of the old stock until the value thereof, over and above the cash assessment, should be paid into court for the benefit of the petitioner and other unsecured creditors, or, if that value could not be determined satisfactorily, to obtain a decree that the petitioner be allowed, upon repayment to the subscribers of the cash which they had paid, to take the new stock subscribed for by holders of the old stock? A decree to either effect would have afforded a complete remedy for the alleged wrong, against the beneficiaries of the wrong, and could have involved no injury to bondholders who had no part in the transactions complained of, or to the new company and the innocent purchasers of its securities. It is not alleged that the facts were not known in time to seek such relief. On the contrary, it is fairly inferable that the plan of reorganization was known to the petitioner's counsel before the sale, and probably before the decree, and might just as well have been brought forward even in its first petition. Another remedy, perhaps yet available, if the alleged wrong was real and substantial, and enforceable without the possibility of injury to innocent third parties, might be sought against the individual holders of the old stock who obtained the new.

A number of cases have been cited which go far towards establishing the validity of the plan of reorganization here in question, but, with a single quotation, I content myself with a reference to them: Kurtz v. Railroad Co., 187 Pa. St. 59, 40 Atl. 988; Pennsylvania Transp. Co.'s Appeal, 101 Pa. St. 576; Dow v. Railway Co., 144 N. Y. 426, 430, 39 N. E. 398; Ferguson v. Railway Co., 17 App. Div. 336, 45 N. Y. Supp. 172; Hutchins v. Hutchins, 7 Hill, 104, 107; Bame v. Drew, 4 Denio, 287, approved in Wicker v. Hoppuck, 6 Wall. 94, 98, 18 L. Ed. 752; Shoemacker v. Katz, 74 Wis. 374, 43 N. W. 151; Central Trust Co. v. United States Rolling-Stock Co.

(C. C.) 56 Fed. 5. In Paton v. Railroad Co. (C. C.) 85 Fed. 838, of an agreement much like this one, Judge Jenkins said:

"The question is presented whether any plan of reorganization can be sustained which does not comprehend the protection of the rights of general creditors of the corporation, or, in other words, whether bondholders have a right to agree with stockholders upon terms which may be agreed upon to give the latter an interest in the new corporation, without including creditors in such plan of reorganization, or at least tendering them an opportunity of joining therein. I fail to perceive any just reason why, in the absence of fraud or oppression, such arrangements should not be upheld in a court of equity. It was competent for these bondholders to exclude stockholders from any agreement. It was also competent for them to exclude creditors. The bondholders, under different mortgages, could agree among themselves, without reference to creditors or stockholders; and, in case of agreement with stockholders, unless the scheme is clearly one to secure to the stockholder that which should justly go to the creditor,—unless it can be said that it was a scheme to defraud creditors,—I perceive no reason which would justify denunciation of the plan. To the contrary, such plans of reorganization have met with general approval, because they tend to avoid sacrifice and loss, and are beneficial to the public. Robinson v. Railroad Co. (C. C.) 28 Fed. 340; Mackintosh v. Railroad Co. (C. C.) 34 Fed. 582; Central Trust Co. of New York v. United States Rolling-Stock Co. (C. C.) 56 Fed. 5, 7; Pennsylvania Transp. Co.'s Appeal, 101 Pa. St. 576."

If the evidence required a finding that the foreclosure proceedings had been in pursuance of the alleged wrongful agreement between the bondholder and stockholder, it would be the duty of the court, under the mandate, "to refuse to confirm the sale until the interests of unsecured creditors have been preserved," and the question would be how that could and should be accomplished. In behalf of the petitioner it is contended, on the authority of Barnes v. Railway Co., Fed. Cas. No. 1,016, Railroad Co. v. Howard, supra, Montgomery Co. v. Dienelt, 133 Pa. St. 585, 19 Atl. 428, and other cases, that the holders of the foreclosed bonds, having accepted new securities in payment of the old, cannot be restored to their original rights; that, "even as to the bonds taken by the old bondholders, their claim is inferior to that of the creditors of the old company, and in this event the proper method of accounting would be to use the net earnings derived from the property, after the payment of the interest on the undisturbed (unforeclosed) bonds of $5,300,000, for the payment of these unsecured creditors"; but that if it should be held that, to the extent of their new bonds, the holders of the original bonds are "entitled to a priority over unsecured creditors, it is denied that under any circumstances could they claim any such lien in behalf of the preferred stock which they accepted in discharge of their bonds." The proposition is extremely inequitable, and the decisions cited do not compel its adoption. This is a suit by the creditor, seeking to have the confirmation of the sale set aside until the rights of creditors cut off by the sale shall have been provided for. What are their rights? Manifestly, to have any surplus of value in the property or its proceeds, over and above the mortgage debts, applied to the payment of their demands. On the sale made there was no surplus, and, on the theory of the sale having been wrongfully obtained, their remedy is another sale under circumstances which will afford them the best practicable opportunity to protect their rights.

If the old bonds have been extinguished, it is because of the sale; and it is not for the petitioner and other creditors to say that as to them the sale was wrongful and shall be set aside, and yet as to them it shall remain so far in force as to remove out of their way a large part of the mortgage debt, which was confessedly valid, and would now be in full force and effect but for the sale, made under the order of the court, and which it is proposed the court shall set aside. Those who would have equity must accept it upon equitable terms. The decision of the supreme court commands the protection of the rights of creditors, but it does not require the sacrifice of the rights of bondholders; and if, on the proofs, the right of the petitioner to relief were established, relief, it seems to me, could be given only by means of a new sale, at which all interested should have an opportunity to bid, and, if more should be realized than necessary to pay the mortgage debts, the remainder should go to the petitioner and other creditors. Net income and sums expended since the sale in betterments should, of course, enter into the accounting. But on that basis the petitioner has indicated neither readiness nor willingness to accept relief, and how in this proceeding it could be awarded on any other theory I do not perceive. If a receiver were again put in charge, the net income would be applicable to the payment of the mortgages, and no benefit could accrue to creditors until the foreclosed mortgages had been fully paid. A receivership for such a purpose, of course, is not to be thought of. If it be true, as alleged in the amended and supplemental petition, that the new railway company has come into possession of earnings or assets to which it was not entitled, and which ought to be paid upon or applied to the satisfaction of the demands of the creditors of the old company, the remedy is plain, and there is no necessity or reason for an attack upon the foreclosure decree and sale.

The proof shows that the judgment recovered by Mills and other demands against the New Albany Company were paid or purchased by the syndicate, and the amount thereof credited against the sum which the syndicate had agreed to pay for the securities turned over to it; but, if unlawful, that was, at most, a wrongful disposition of the proceeds of the sale, and did not affect the validity of the sale itself. The petitioner's remedy, if any, should be sought against those who obtained, or possibly against those who were instrumental in giving, the wrongful advantage.

The answer of the Chicago, Indianapolis & Louisville Railway Company to the amended petition asserts the rights of an innocent purchaser under the foreclosure decree, the appeal from which was taken and prosecuted without obtaining a supersedeas, but it is not necessary to enter upon that question. The exceptions to the report of the special master will be overruled, and a decree may be prepared accordingly.